UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                   :

In the Matter of the Application of     :
                                   :

MINEFINDERS CORPORATION LTD.,   :     08 Civ. 6319 (NRB)
                                   :

           Petitioner,        :
                                   :

         -against-         :
                                   :

AUSENCO INTERNATIONAL PTY LTD.,   :
                                   :

           Respondent.       :
                                   :

--------------------------------------------------------x

## RESPONDENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO APPLICATION BY
## PETITIONER MINEFINDERS CORPORATION LTD.
## <u>FOR A STAY OF ARBITRATION</u>

PATTERSON BELKNAP WEBB & TYLER LLP
Stephen P. Younger (*spyounger@pbwt.com*)
Sarah E. Zgliniec (*sezgliniec@pbwt.com*)
Michael A. Becker (*mabecker@pbwt.com*)
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Respondent Ausenco International Pty Ltd.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................... 1

    A. The Parties ...................................................................................... 1

    B. The Underlying Dispute in the AAA-ICDR Arbitration .......................... 2

ARGUMENT ................................................................................................ 4

I. The Issue of Whether Mindfinders Is a Proper Party to the
   Arbitration Should Be Decided by the Arbitrators ........................................ 4

II. Minefinders Is a Proper Party to the Arbitration .......................................... 8

    A. The Plain Language of the CMA Requires Minefinders To
       Arbitrate Ausenco's Claims .............................................................. 8

    B. Ordinary Principles of Contract and Agency Law Require
       Minefinders to Comply with the Arbitration Clause ........................... 11

       1. Minefinders Is the "Alter Ego" of CMD .................................. 11

          a. Minefinders Exercises "Complete Domination" over
            CMD and the Dolores Mine .......................................... 12

          b. Minefinders Has Used Its Domination of CMD To
            Withhold Payments Due to Ausenco ............................... 17

       2. Minefinders Has Received a Direct Benefit From the CMA and
         Must Be Estopped from Avoiding Arbitration ........................... 17

    CONCLUSION ......................................................................................... 20

1885793v.1

# TABLE OF AUTHORITIES

Page

## CASES

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
    475 U.S. 643 (1986)..................................................................4

*Abram Landau Real Estate v. Bevona*,
    123 F.3d 69 (2d Cir. 1997)......................................................4, 6

*Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*,
    445 F.3d 121 (2d Cir. 2006)....................................................5

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
    170 F.3d 349 (2d Cir. 1999)....................................................17

*Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*,
    122 F.3d 130 (2d Cir. 1997)............................................11, 12, 14

*Apollo Computer, Inc. v. Berg*,
    886 F.2d 469 (1st Cir. 1989)....................................................6

*Bar-Ayal v. Time Warner Cable Inc.*,
    No. 03 CV 9905, 2006 U.S. Dist. LEXIS 75972
    (S.D.N.Y. Oct. 16, 2006).........................................................6

*Bell v. Cendant Corp.*,
    293 F.3d 563 (2d Cir. 2002)....................................................6

*Contec Corp. v. Remote Solution Co., Ltd.*,
    398 F.3d 205 (2d Cir. 2005).....................................................5, 6

*Deloitte Noraudit A/S v. Deloitte Haskings & Sells, U.S.*,
    9 F.3d 1060 (2d Cir. 1993).......................................................17

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)..............................................................4

*Graff v. Billet*,
    64 N.Y.2d 899, 487 N.Y.S.2d 733 (1984) ..................................11

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*,
    252 F.3d 218 (2d Cir. 2001).....................................................7

## TABLE OF AUTHORITIES
### (continued)

Page

*MAG Portfolio Consultant, GmbH v. Merlin Biomed Group LLC,*
    268 F.3d 58 (2d Cir. 2001).................................................................................17

*Mastrobuono v. Shearson Lehman Hutton, Inc.,*
    514 U.S. 52 (1995)...........................................................................................11

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985).............................................................................................7

*Morris v. New York State Dep't of Taxation & Fin.,*
    82 N.Y.2d 135, 603 N.Y.S.2d 807 (1993)............................................... 11-12

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983)...................................................................................................7

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Champps Entm't, Inc.,*
    No. 04 Civ. 6163, 2004 U.S. Dist. LEXIS 25052
    (S.D.N.Y. Dec. 13, 2004)....................................................................................7

*Rudolph & Beer, L.L.P. v. Roberts,*
    260 A.D.2d 274, 688 N.Y.S.2d 553 (1st Dep't1999)...............................9, 11

*Shaw Group Inc. v. Triplefine Int'l Corp.,*
    322 F.3d 115 (2d Cir. 2003)..............................................................................4, 9

*Smith Barney Shearson, Inc. v. Sacharow,*
    91 N.Y.2d 39, 666 N.Y.S.2d 990 (1997).........................................................4

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v.*
    *Smith Cogeneration Int'l, Inc.,*
    198 F.3d 88 (2d Cir. 1999)................................................................................6

*Thomson-CSF, S.A. v. American Arbitration Ass'n,*
    64 F.3d 773 (2d Cir. 1995)................................................................9, 11, 17

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,*
    933 F.2d 131 (2d Cir. 1991)..............................................................................12

iii

## TABLE OF AUTHORITIES
### (continued)

Page

### STATUTES

9 U.S.C. § 1 (2008) ................................................................................................4

9 U.S.C. § 2 (2008) ................................................................................................4

9 U.S.C. § 203 ........................................................................................................3

9 U.S.C. § 205 ........................................................................................................3

28 U.S.C. § 1446 ....................................................................................................3

## PRELIMINARY STATEMENT

Ausenco International Pty Ltd. ("Ausenco") submits this memorandum of law in opposition to the application by Minefinders Corporation Ltd. ("Minefinders") for a permanent stay of the arbitration commenced by Ausenco under the auspices of the International Centre for Dispute Resolution of the American Arbitration Association. The Court should deny that application.

Minefinders contends that it is not a proper party to the arbitration because it is not a signatory to the arbitration agreement. However, the issue of whether Minefinders is a proper party to the arbitration should be decided by the arbitration panel, not the Court. Should the Court reach that issue, it should deny Minefinders' application for a stay, for two reasons. First, the plain language of the arbitration agreement requires Minefinders to arbitrate the dispute. Second, ordinary principles of contract and agency law – including the fact that Minefinders is the "alter ego" of CMD, its co-respondent in the arbitration, and has directly benefited from the relevant agreement – compel the conclusion that Minefinders is a proper party to the arbitration.

## STATEMENT OF FACTS

### A.    The Parties

Ausenco is a proprietary limited company organized under the laws of Australia. Ausenco, which has operations worldwide, specializes in the provision of engineering and construction management services for mining projects.

Minefinders is an Ontario, Canada company that is registered as an extra-provincial company pursuant to the laws of British Columbia. Minefinders is based in Vancouver and is engaged in precious metals mining and exploration.

1885793v.1

Minefinders has directed the construction and commissioning of the Dolores Mine in Chihuahua, Mexico, an open pit heap leach gold and silver mine. Compania Minera Dolores S.A. de C.V. ("CMD") – a wholly-owned subsidiary of Minefinders – is the legal instrument through which Minefinders runs its operations at the Dolores Mine.

**B.    The Underlying Dispute in the AAA-ICDR Arbitration**

The relationship between Ausenco and Minefinders/CMD is governed by, among other agreements, the Construction Management Agreement dated July 13, 2006 (the "CMA"). *See* Declaration of James Yeates in Opposition to Minefinders' Application To Stay Arbitration dated July 22, 2008 ("Yeates Decl."), Ex. A. Under the terms of the CMA, which is governed by New York law, Ausenco was engaged to act as Construction Manager for the Dolores Mine project. *See* Yeates Decl., Ex. A, arts. 4.2, 21.7. The signatories to the CMA are Ausenco and CMD.

The dispute currently in arbitration arises from the failure of CMD and/or Minefinders to pay Ausenco for services rendered pursuant to the CMA. To date, Ausenco is owed the principal amount of USD$1,929,893.20, plus interest on past due invoices for construction management services that Ausenco provided from December 1, 2007 through March 31, 2008, when the CMA was terminated. On April 29, 2008, Ausenco demanded in writing that the unpaid invoices be paid within seven days, but CMD and Minefinders have refused to pay.

In response to the non-payment of its fees, Ausenco filed a Demand for Arbitration with the International Centre for Dispute Resolution ("ICDR") of the

1885793v.1

American Arbitration Association ("AAA") on June 2, 2008 pursuant to Article 17(d) of

the CMA, which provides in relevant part as follows:

> The Parties agree that any claim or dispute between them or
> against any agent, employee, successor, or assign of the
> other, whether related to this [CMA] or otherwise, and any
> claim or dispute related to the [CMA] or the relationship or
> duties contemplated by this contract, including the validity
> of this arbitration clause, shall be resolved by binding
> arbitration under the rules of the American Arbitration
> Association.

Yeates Decl., Ex. A, art. 17(d). Ausenco's Demand for Arbitration names Minefinders

and CMD as respondents and asserts claims for breach of contract, unjust enrichment,

and quantum meruit. *See* Demand For Arbitration, Declaration of Sarah E. Zgliniec in

Opposition to Minefinders' Application To Stay Arbitration dated July 22, 2008

("Zgliniec Decl."), Ex. A.

On June 12, 2008, counsel for Ausenco and CMD participated in an initial

case management teleconference with the ICDR administrator. The participants in that

meeting agreed to select party-appointed arbitrators by July 16, 2008, but subsequently

agreed to extend that deadline to July 29, 2008.

On July 2, 2008, CMD submitted its response to Ausenco's Demand for

Arbitration. Minefinders submitted no response, and instead, filed a Notice of Petition

To Stay Arbitration Pursuant to CPLR § 7503(b) in New York State Supreme Court of

New York County. On July 14, 2008, Ausenco removed that action to this Court

pursuant to 28 U.S.C. § 1446 and 9 U.S.C. §§ 203, 205.

On July 15, 2008, the ICDR administrator informed counsel for Ausenco

and counsel for Minefinders and CMD that despite Minefinders' petition, the ICDR was

3

proceeding with the administration of the case and that the arbitration would move

forward accordingly.

## **ARGUMENT**

**I.    THE ISSUE OF WHETHER MINDFINDERS IS A PROPER
       PARTY TO THE ARBITRATION SHOULD BE DECIDED BY THE
       ARBITRATORS**

The CMA's broad arbitration clause requires that the arbitral tribunal – not

this Court – determine whether Minefinders is a proper party to the arbitration that

Ausenco has commenced.

The CMA is a contract involving international commerce and is therefore

governed by the Federal Arbitration Act (the "FAA").  *See* 9 U.S.C. §§ 1, 2 (2008).

Under the FAA, "there is a general presumption that the issue of arbitrability should be

resolved by the courts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45

(1995).  But if "the parties clearly and unmistakably provide otherwise," the question of

"whether the parties agreed to arbitrate" should be decided by the arbitrator.[1]  *AT&T*

*Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see Abram Landau*

*Real Estate v. Bevona*, 123 F.3d 69, 73 (2d Cir. 1997) ("When parties disagree about

whether they ever entered into an arbitration agreement, a court decides that issue, absent

a clear and unmistakable delegation of that authority to the arbitrator.")

The Second Circuit has held that such "clear and unmistakable" evidence

exists when the parties incorporate into the arbitration clause a reference to arbitral rules

that allow the arbitrators to decide issues of their own jurisdiction and the existence,

---

[1] New York law applies the same standard as federal law with respect to who determines
arbitrability:  it is a question for the court unless there is "a 'clear and unmistakable' agreement to
arbitrate arbitrability."  *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir.
2003) (quoting *Smith Barney Shearson, Inc. v. Sacharow*, 91 N.Y.2d 39, 45-46, 666 N.Y.S.2d
990 (1997)).

1885793v.1

scope, or validity of the arbitration agreement. *See, e.g., Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (holding that the parties' incorporation of AAA rules, including the rule granting the arbitration panel jurisdiction over the existence and scope of the arbitration agreement, constitutes "clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.").

Such unmistakable evidence exists here. Article 17(d) of the CMA directs that "any claim or dispute related to the CMA" shall be subject to "binding arbitration under the rules of the American Arbitration Association." Yeates Decl., Ex. A, art. 17(d). Included in those AAA rules is Article 15, which provides that "[t]he tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[2] Article 15, American Arbitration Association, International Dispute Resolution Procedures: International Arbitration Rules (amended and effective March 1, 2008), Zgliniec Decl., Ex. B. Ausenco has invoked these AAA rules in its Demand for Arbitration. *See* Zgliniec Decl., Ex. A at 1.

The parties' incorporation of the AAA rules into Article 17(d) of the CMA provides the requisite "clear and unmistakable" evidence of the parties' intent to "empower [the] arbitrator to decide issues of arbitrability." *Contec*, 398 F.3d at 208. *Accord Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 126

---

[2] Rule R-7 of the Commercial Rules of the American Arbitration Association is nearly identical to Article 15 of the International Arbitration Rules: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Rule 7(a), American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures (amended and effective Sept. 1, 2007), Zgliniec Decl., Ex. C.

(2d Cir. 2006); *Bar-Ayal v. Time Warner Cable Inc.*, No. 03 CV 9905, 2006 U.S. Dist. LEXIS 75972, at *32 (S.D.N.Y. Oct. 16, 2006).

Such a result makes perfect sense here. As described below, whether Ausenco's claims against Minefinders ought to remain in arbitration turns on the construction of the contract terms to which the parties agreed and discerning the parties' intention. Such contract interpretation is plainly the province of the arbitrators.

In its petition for a stay, Minefinders essentially argues that the issue of whether an entity is a proper party to an arbitration is an issue distinct from those delegated to the arbitrators under the AAA rules, and is a question requiring judicial resolution. That is not the case. The Second Circuit has held that "whether an entity is a party to an arbitration agreement also is included within the broader issue of whether the parties agreed to arbitrate" – *i.e.*, the very issue that the parties delegated to the arbitrators in Article 17(d) of the CMA. *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 95 (2d Cir. 1999). In other words, the delegated question of arbitrability includes not only *whether* a claim is arbitrable, but *against whom* it is arbitrable. *See Contec*, 398 F.3d at 210; *Apollo Computer, Inc. v. Berg*, 886 F.2d 469 (1st Cir. 1989); *see also, e.g., Bell v. Cendant Corp.*, 293 F.3d 563, 567-68 (2d Cir. 2002) (where "the existence of a broad agreement to arbitrate is obvious," a question as to whether the arbitration clause reaches all a party's claims "is a question of scope"); *Abram Landau Real Estate*, 123 F.3d at 72 (when "parties disagree about whether they ever entered into an arbitration agreement," that issue can be delegated to the "authority of an arbitrator" if such delegation is supported by "clear and unmistakable" evidence).

6

The arbitration clause at issue here is unquestionably broad: it refers not only to "any claim or dispute between [the Parties]" but also to "any claim or dispute related to the [CMA]." Yeates Decl., Ex. A, art. 17(d). This kind of language "gives rise to a 'presumption of arbitrability' and requires 'arbitration of even a collateral matter . . . if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.'" *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Champps Entm't, Inc.*, No. 04 Civ. 6163, 2004 U.S. Dist. LEXIS 25052, at *7 (S.D.N.Y. Dec. 13, 2004) (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)). As explained below, a determination of the arbitrability of Ausenco's claim against Minefinders requires just such contract construction – a task which the United States Supreme Court has deemed appropriate for the arbitrators to undertake in the context of an arbitrability determination. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Indeed, the Court has held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* Moreover, the delegation of this question to the arbitral tribunal is consistent with the strong federal policy favoring arbitration in the context of international transactions. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 629-31 (1985).

Accordingly, whether Minefinders is a proper party to the arbitration is an issue that should be left to the arbitral tribunal based on (1) the clear and unmistakable evidence of the parties' intent to delegate issues of arbitrability to the arbitral tribunal by incorporating the AAA rules into the CMA, and (2) the fact that resolving this issue

7

implicates the "existence" and "scope" of the arbitration clause and requires "construction of the contract language itself." As such, Minefinders' application for a permanent stay of the arbitration should be denied.

## II.    MINEFINDERS IS A PROPER PARTY TO THE ARBITRATION

For the reasons set forth above, it is the province of the arbitral tribunal – not the Court – to decide whether Minefinders is subject to the arbitration provisions of the CMA. But should this Court decide to determine that question itself, Minefinders' application for a stay should still be denied for two separate and distinct reasons. First, the plain language of the CMA demonstrates that Minefinders is a proper party to the arbitration. Second, ordinary principles of contract and agency further compel the conclusion that Minefinders must arbitrate this dispute.

### A.    The Plain Language of the CMA Requires Minefinders To Arbitrate Ausenco's Claims

Minefinders claims that it never agreed to submit any dispute with Ausenco to arbitration, but that argument ignores the plain and unambiguous language of the CMA. As noted above, the arbitration clause contains the following language:

> ***The Parties*** agree that any claim or dispute between them or against any agent, employee, successor, or assign of the other, whether related to this [CMA] or otherwise, and any claim or dispute related to the [CMA] or the relationship or duties contemplated by this contract, including the validity of this arbitration clause, shall be resolved by binding arbitration under the rules of the American Arbitration Association.

Yeates Decl., Ex. A, art. 17(d) (emphasis added). The CMA defines "***the Parties***" as be "the Construction Manager" on the one hand (*i.e.*, Ausenco), and "***the Company***" on the other. *See id.* pmbl. ¶ D. The CMA defines "***the Company***" as Compania Minera Dolores S.A. de C.V., Yeates Decl., Ex. A, pmbl., but also expressly provides in Article

8

1.2(c) that "reference to the Company *includes all related corporate bodies of the Company*,"[3] *id.* art. 1.2(c) (emphasis added).

There is no question that Minefinders is a "related corporate body" of CMD. For that reason, the arbitration clause in Article 17(d) of the CMA should be interpreted as requiring both CMD and Minefinders to arbitrate Ausenco's claims. Only that interpretation is consistent with the well-established principle of New York law that courts must give "full meaning and effect to all [a contract's] provisions," and "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *Shaw Group,* 322 F.3d at 124 (internal quotations and citations omitted). Applying those principles here, the CMA must be interpreted such that Minefinders is bound by the arbitration clause; no alternative reading of the text makes any sense in light of Article 1.2(c).[4]

That conclusion is bolstered by the fact that the CMA named Mark Bailey – the President of Minefinders – as the "Senior Executive" for "the Company." Yeates

---

[3] Similarly, Article 1.2(d) provides that "reference to the Construction Manager includes all related corporate bodies of the Construction Manager." Yeates Decl., Ex. A, art. 1.2(d).

[4] The situation before the Court differs substantially from the situation in *Thomson-CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773 (2d Cir. 1995), a case in which a non-signatory sought to avoid arbitration brought by one signatory to a contract. The arbitration clause at issue failed to define which "parties" were subject to arbitration, but it did define the two signatories to the underlying contract to include the signatories and their affiliates. *Id.,* 64 F.3d at 775. The Second Circuit held in favor of the non-signatory, but, importantly, the non-signatory had become an affiliate of the other signatory only *after* the underlying contract had been executed. *Id.,* 64 F.3d at 775, 780. In contrast, the present case involves a company, Minefinders, that was a "related corporate body" of CDM not just at the signing of the Construction Management but, as described more fully below, that also actively negotiated the CMA. Minefinders even proposed the dispute resolution provision and defined terms at issue here. *See* Yeates Decl. ¶¶ 4-7. Declaration of Gary Gantner in Opposition to Minefinders' Application For a Stay of Arbitration dated July 22, 2008 ("Gantner Decl.") ¶¶ 7, 9-10. Accordingly, this is not a case in which the non-signatory has been unfairly caught in a net that is not of its own making, and Minefinders should not now be allowed to disavow the very language it proposed. *See Rudolph & Beer, L.L.P. v. Roberts,* 260 A.D.2d 274, 276, 688 N.Y.S.2d 553, 555-56 (1st Dep't1999) ("Plaintiff's effort to avoid the arbitration clause is particularly disingenuous, in light of the fact that plaintiff is the one who drafted this contract provision . . .").

9

Decl., Ex. A, art. 1.1 & sched. 7.  Pursuant to article 17(b) of the CMA, the designated

Senior Executives were required to "use their best endeavours to resolve the dispute by

negotiation" before commencing arbitration proceedings pursuant to article 17(d).  *Id.*,

art. 17(b).  This confirms that the CMA's use of the term "the Company" refers to both

CMD *and Minefinders*.

      Accordingly, the reference to "the Parties" in the arbitration clause was

clearly intended to require both CMD and Minefinders to submit to binding arbitration

under the AAA rules in connection with "any claim or dispute related to the CMA or the

relationship or duties contemplated by [it]".  *See* Yeates Decl., Ex. A, art. 17(d).

      Even if the Court were to find some hint of ambiguity in the CMA's

language on this issue, extrinsic evidence supports Ausenco's interpretation.  It was

Minefinders – not CMD – that negotiated the CMA with Ausenco, and it was

Minefinders that proposed the arbitration clause at issue.  *See* Yeates Decl. ¶¶ 4-7;

Gantner Decl. ¶¶ 7, 9-10.  In those negotiations, Minefinders made it clear that it sought

an arbitration clause that covered the "related corporate bodies" of the signatories so that

it could pursue the ultimate holding company of Ausenco International Pty Ltd. in the

necessary situation.  *See* Yeates Decl. ¶¶ 6-7.  Minefinders now seeks to deprive Ausenco

of using that very same "related corporate bodies" language to pursue the ultimate parent

company of CMD: Minefinders.

      Such a one-sided interpretation is unjust and is contrary to well-

established rules of contract interpretation.  And, it would promote judicial inefficiency

by requiring both an arbitration and a collateral court action on exactly the same issue.

Thus, Minefinders "cannot overcome the common law rule of contract interpretation that

a court should construe ambiguous language against the interest of the party that drafted it." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62-63 (1995) (*citing Graff v. Billet*, 64 N.Y.2d 899, 902, 487 N.Y.S.2d 733 (1984)); *see Rudolph & Beer, L.L.P*, 260 A.D.2d at 276, 688 N.Y.S.2d at 555-56 (N.Y. 1st Dep't. 1999) ("Plaintiff's effort to avoid the arbitration clause is particularly disingenuous, in light of the fact that plaintiff is the one who drafted this contract provision . . .").

**B.    Ordinary Principles of Contract and Agency Law Require Minefinders to Comply with the Arbitration Clause**

In addition, the Court should rule that Minefinders is obligated to arbitrate Ausenco's claims based on "ordinary principles of contract and agency." *Thomson-CSF, S.A.*, 64 F.3d at 776 (internal quotations omitted); *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 133 (2d Cir. 1997). First, Minefinders should be bound to the arbitration clause because it is the "alter ego" of CMD and has prevented the payment of Ausenco's fees. *See Thomson-CSF, S.A.*, 64 F.3d at 776 (discussing the "alter ego" theory). Second, Minefinders should be estopped from avoiding arbitration because it has directly benefited from the CMA:  it has publicized Ausenco's role in bringing the Dolores Mine to completion and has exploited those developments to promote its business. *Id.* (discussing the "estoppel" theory).

**1.    Minefinders Is the "Alter Ego" of CMD**

The Court should find that Minefinders is the "alter ego" of CMD because Minefinders "exercise[s] complete domination" over CMD with respect to the Dolores Mine and has used its domination of CMD "to commit a . . . wrong" against Ausenco, *i.e.*, the non-payment of approximately $1.9 million due to Ausenco for services rendered pursuant to the terms of the CMA. *See Am. Fuel Corp.*, 122 F.3d at 134 (citing *Morris v.*

11

*New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 603 N.Y.S.2d 807 (1993));

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138-39 (2d

Cir. 1991) ("Liability [of the parent company] may be predicated either upon a showing

of fraud or upon complete control by the dominating corporation that leads to a wrong

against third parties.").

<b>a.     Minefinders Exercises "Complete Domination"<br>over CMD and the Dolores Mine</b>

Minefinders exercises "complete domination" over CMD and the Dolores

Mine. Minefinders and CMD are completely intertwined, sharing functions, officers,

personnel, and even e-mail addresses. And, as shown below, Minefinders uses the

Dolores Mine as if it owns the property directly, rather than through CMD. These are the

hallmarks of an "alter ego" relationship. *See Am. Fuel Corp.*, 122 F.3d at 134; *Wm.*

*Passalacqua Builders, Inc.*, 933 F.2d at 139.

First, the negotiation CMA itself demonstrates the overlap in personnel

between Minefinders and CMD and the failure of Minefinders to deal at arms length with

its subsidiary. During the first half of 2006, Ausenco negotiated the CMA with

Minefinders' Todd Fayram, who was simultaneously a Vice President of Minefinders and

a "general manager" or "project manager" of CMD. *See* Yeates Decl. ¶ 4; Gantner Decl.

¶ 9; *see also* "Minefinders Becoming Producer," *World Mining Stocks* (Oct. 2006) at 70,

Zgliniec Decl, Ex. D. Even before the CMA was formally negotiated, Fayram had met at

various times with Gary Gantner, the then-President of Ausenco Americas, LLC, an

Ausenco affiliate. *See* Gantner Decl. ¶ 9. In fact, Gantner discussed Ausenco's

engagement at the Dolores Mine with Fayram, Minefinders' President Mark Bailey, and

other Minefinders personnel at various points prior to the CMA being signed. *Id.* ¶¶ 6-9.

12

These interactions underscore the fact that it was Minefinders, not CMD, that was negotiating the terms of Ausenco's engagement, even though it was Minefinders' subsidiary that eventually signed the CMA.[5]

Second, the terms of the CMA itself demonstrate that it was Minefinders – not CMD – that was empowered to exercise business discretion with respect to the Dolores Mine and Ausenco's role pursuant to the CMA.  In addition to negotiating the CMA, Fayram is named in the CMA as "the Company's Representative." *See* Yeates Decl., Ex. A, art. 1.1 & sched. 6.  This meant that Ausenco was obligated to "liaise" with Fayram "from time to time for all matters (including instructions, notifications and authorisations) relating to the Services and Additional Services and [the CMA]."[6]  *Id.* art. 19.1.  As such, Minefinders – in the person of Todd Fayram, a Vice President of Minefinders – was Ausenco's contractually established point of contact for virtually *all* matters relating to the CMA.

Moreover, the CMA named Mark Bailey – the President of Minefinders – as "the Senior Executive for the Company." *See* Yeates Decl., Ex. A, sched. 7.  This required Ausenco to try to negotiate any disputes *with Minefinders* (*i.e.*, not with CMD) before commencing arbitration proceedings. *See* Yeates Decl., Ex. A, art. 17(b); Gantner Decl. ¶ 11.  This further emphasizes the lack of any meaningful distinction between Minefinders and CMD.  *Id.* art. 1.1 & Sched. 7.

---

[5] CMD may have been named the signatory in order to create potential tax advantages for Minefinders. *See* Gantner Decl. ¶ 13.

[6] The CMA defines "Services" and "Additional Services" essentially to include all services provided pursuant to the CMA, including both enumerated duties and additional requirements that would typically be provided "for projects of like scope and nature." Yeates Decl., Ex. A, art. 1.1.

13

Third, correspondence between the parties and publicly available statements by Minefinders further confirm that Minefinders – not CMD – was the decision-making entity with regard to the Dolores Mine, that Minefinders was treating the CMD as an "independent profit center," *see Am. Fuel Corp.*, 122 F.3d at 134, and that Minefinders was using CMD's "property" – the Dolores Mine – as its own.

For example, on August 1, 2007, Gregg Bush of Minefinders wrote to Carlos Torres – an Ausenco project manager – concerning repairs that were taking place at the site. Bush's letter – sent on Minefinders letterhead and copied to Minefinders' Mark Bailey – notified Ausenco that Minefinders "request[s] that Ausenco formally advise Minefinders of the position of Ausenco's insurers with respect to this situation." *See* Letter dated August 1, 2007 from Gregg Bush, Vice President Operations, Minefinders Corporation Ltd. to Carlos Torres, Project Manager, Ausenco, Yeates Decl., Ex. C. The letter further specifies that "*Minefinders* requires formal communication from Ausenco regarding proposals to manage this risk in the future." *Id.* (emphasis added). In addition, it was Minefinders – not CMD – that was actually paying Ausenco for the services it provided. Gantner Decl. ¶ 14. These facts make it crystal clear that Minefinders – not CMD – was the entity pulling the strings, directing the mine's operations, and exercising wide discretion over the project.

Furthermore, Minefinders routinely treated the Dolores Mine as its own property and as its own future profit center. In a December 26, 2005 interview, Mark Bailey, Minefinders' President, described the Dolores site as Minefinders' "most significant discovery to date" and remarked that the site "will become a very profitable

14

mine in the near future." "Mark Bailey – Minefinders Corporation Ltd (MFN)," *The Wall Street Transcript* (Dec. 26, 2005), Zgliniec Decl., Ex. E.

      A January 2007 press release, which Minefinders filed with the U.S. Securities and Exchange Commission, proclaimed that "[Minefinders] reports that its 18,000 tonne per day Dolores open pit mine, in Chihuahua Mexico, is on schedule and on budget to produce gold and silver in the third quarter of 2007." Press Release, Minefinders Corporation Ltd., *Dolores Gold and Silver Mine on Schedule and on Budget* (Jan. 18, 2007), Zgliniec Decl., Ex. F. Notably, the press release refers further requests for information to Minefinders itself. *Id.*

      And as recently as May 2008, an investment analyst who toured the Dolores Mine facility reported that Minefinders – not CMD – had "purchased all new crushing and screening equipment, as well as rolling stock" for use on the site. Mike Niehauser, "Analyst Tour of Minefinders' Dolores Mine," *Seeking Alpha* (May 11, 2008), Zgliniec Decl., Ex. G.

      Similarly, in a June 19, 2007 webcast to investors, Mark Bailey described the Dolores Mine as Minefinders' "flagship" that will "make Minefinders a producer." Presentation by Mark Bailey, Minefinders Corporation Ltd. (June 19, 2007), Beacon Rock Research at 22:55, Zgliniec Decl., Ex. H. Bailey also described the site's "production profile" and the option to stockpile ore, noting that "I probably won't bother stockpiling it." *Id.* at 16:04-16:14. Bailey then discussed various operational decisions that Minefinders had yet to make, including whether to construct a mill facility or underground production facilities. *Id.* at 16:15-16:40. In addition, Bailey stated that "we've bought all new equipment" for the site. *Id.* at 17:04. These disclosures further

support the proposition that Minefinders directs the operations – including construction activities – at the Dolores Mine.

Not surprisingly, the Dolores Mine was the centerpiece of Minefinders' annual reports in 2006 and 2007. *See* Minefinders Corporation Ltd., Annual Report 2006 – "Building the Dolores Mine," Zgliniec Decl., Ex. I; Minefinders Corporation Ltd.: Annual Report 2007 – New Gold-Silver Producer in 2008, Zgliniec Decl., Ex. J. The 2007 Annual Report describes the "many milestones" achieved by Minefinders in 2007, "including commencing mining on the Dolores deposit in late October with pre-stripping and haul road development." Annual Report 2007 at 2, Zgliniec Decl., Ex. J. Detailed descriptions of the mine's undiscounted pre-tax net present value and the timetable for its future development make *no mention whatsoever of CMD*; instead, Minefinders portrays itself as the owner and operator of the Dolores Mine. *Id.* at 4-5. It is Minefinders – not CMD – that is described as "working with the local communities in the region surrounding the Dolores Mine . . . to ensure that our presence has a positive impact . . ." *Id.* at 8. Indeed, in the "Company Overview," Minefinders refers to its "wholly-owned Dolores gold and silver mine in Mexico," leaving CMD out of the picture completely. *Id.* at 9. Furthermore, Minefinders concedes that it "has no revenue except interest income and will continue to incur negative cash flows from operations until the Dolores mine reaches commercial production." *Id.* at 9.

These facts make it quite clear that CMD is merely the conduit through which Minefinders exerts total control over the Dolores Mine and its considerable reserves and that Minefinders views the Dolores Mine as its own future profit center.

1885793v.1

**b.    Minefinders Has Used Its Domination of CMD
To Withhold Payments Due to Ausenco**

On the basis of Minefinders' "complete domination" of CMD, Minefinders

cannot reasonably contend that CMD's failure to pay Ausenco is a matter of its own

prerogative rather than a determination by the decision-makers at Minefinders.

Furthermore, neither CMD nor Minefinders can seriously contest the fact that Ausenco

has not been paid the approximately $1.9 million plus interest it is owed for services

provided from December 1, 2007 to March 31, 2008 pursuant to the CMA.  *See* Zgliniec

Decl., Ex. A  ¶¶ 14-16.  The wrong that has been inflicted on Ausenco – *i.e.*, the non-

payment of approximately $1.9 million plus interest – has been perpetrated as much by

Minefinders as by CMD.

Accordingly, the Court should find that Minefinders, as the "alter ego" of

CMD, is bound by the arbitration clause in the CMA consistent with "ordinary principles

of contract and agency."  *See Thomson-CSF, S.A.*, 64 F.3d at 776.

**2.    Minefinders Has Received a Direct Benefit From the
CMA and Must Be Estopped from Avoiding
Arbitration**

In addition, Minefinders should be estopped from avoiding arbitration

because it has received a "direct benefit" from the contract containing the arbitration

clause.  *See Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d

Cir. 1999); *Deloitte Noraudit A/S v. Deloitte Haskings & Sells, U.S.*, 9 F.3d 1060, 1064

(2d Cir. 1993).  "Under the estoppel theory, a company knowingly exploiting an

agreement with an arbitration clause can be estopped from avoiding arbitration despite

having never signed the agreement."  *MAG Portfolio Consultant, GmbH v. Merlin*

17

*Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (internal brackets and quotation marks omitted).

Here, Minefinders has received a direct benefit from the CMA because the existence of that contract, and the activities undertaken pursuant to it, have brought the Dolores Mine project to the brink of completion and have enabled Minefinders to publicize its imminent production capabilities to investors. As a result, Minefinders is trying to extract the benefits of Ausenco's services without paying for them.

As noted above, Minefinders' President, Mark Bailey, described the mine as Minefinders' "flagship," explaining that the mine will "make Minefinders a producer." *See* Zgliniec Decl., Ex. H. Elsewhere, Bailey himself has described the benefits of becoming a "producer":

> There are two important things to remember when you evaluate Minefinders . . . . The first is the fact that we are in a transition phase from an explorer to producer, and we are currently trading at a market cap that is typical of explorers, which is about half of a company's net asset value. Producers typically are valued at two or three times their net asset values. As we make this transition, we should get a favourable re-rating.

Zgliniec Decl., Ex. D at 70. Indeed, Minefinders has raised at least US$85 million through the placement of convertible notes on the back of a prospectus principally focused on Minefinders' development of the Dolores Mine and the construction of its facilities. *See* Amended Registration Statement Filed on Form F-10 dated Nov. 29, 2006, Zgliniec Decl., Ex. K. And Minefinders has referred to the progress of construction at the site in other SEC filings, specifically referring to Ausenco's role in managing site construction. *See, e.g.*, Zgliniec Decl., Ex F, Ex. I at 4.

18

In turn, securities analysts have focused on the progress of construction at the site and given the project favorable coverage on that basis. *See, e.g.*, Mike Niehauser, "Analyst Day at the Dolores Mine," *Seeking Alpha* (Mar. 2, 2007), Zgliniec Decl., Ex. L; Mike Niehauser, "Minefinders' Dolores Mine Should Meet Expectations," *Seeking Alpha* (Jun. 25, 2007), Zgliniec Decl. Ex. M. Minefinders' Mark Bailey even emphasized to investors in January 2008 that because construction was 95 percent complete, "that's a good reason to invest." Interview with Mark Bailey, President, Minefinders Corporation Ltd., *Wall Street Reporter* (Jan. 21, 2008), Zgliniec Decl., Ex. N. Moreover, Minefinders' Gregg Bush – who also held a position with CMD – expressly told an Ausenco employee by e-mail that how Ausenco chose to deal with an issue that arose in the course of construction would have an impact on "Minefinders['] image and reputation." E-mail dated Oct. 18, 2007 from Gregg Bush to Paul Leach, Yeates Decl., Ex. D.

In sum, Minefinders has exploited the CMA to enhance Minefinders' reputation in the marketplace, to raise funds in the capital markets, and to maintain the value of its publicly traded securities. Minefinders cannot now turn its back on the very same agreement from which it has derived these benefits to its "image and reputation." As such, Minefinders should be estopped from seeking to avoid arbitration pursuant to the terms of the CMA.

19

## CONCLUSION

For the foregoing reasons, Ausenco respectfully submits that Minefinders'

application for a stay of arbitration should be denied with costs.


Dated:  New York, New York
        July 22, 2008

                PATTERSON BELKNAP WEBB & TYLER LLP


                By:   /s/ Sarah E. Zgliniec
                    Stephen P. Younger (*spyounger@pbwt.com*)
                    Sarah E. Zgliniec (*sezgliniec@pbwt.com*)
                    Michael A. Becker (*mabecker@pbwt.com*)
                    1133 Avenue of the Americas
                    New York, New York 10036
                    (212) 336-2000

                    *Attorneys for Respondent Ausenco International*
                    *Pty Ltd.*