UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                              :

In the Matter of the Application of    :

MINEFINDERS CORPORATION LTD.,    :

            Petitioner,    :

                       :       08 Civ. 6319 (NRB)

        -against-    :

AUSENCO INTERNATIONAL PTY LTD.,  :

           Respondent.    :

                       :
-------------------------------------------------------x

## DECLARATION OF JAMES YEATES IN OPPOSITION TO MINEFINDERS' APPLICATION FOR A STAY OF ARBITRATION

I, JAMES YEATES, declare as follows:

1.     I submit this declaration and the documents attached hereto in support of the memorandum of law of Ausenco International Pty Ltd. opposing the application by Minefinders Corporation Ltd. ("Minefinders") for a stay of arbitration in the above-captioned case.  The information in this declaration is based on my personal knowledge.

2.     I am Commercial Counsel for Ausenco Services Pty Ltd., a wholly-owned subsidiary of Ausenco Ltd.  Ausenco Services Pty Ltd. and Ausenco Ltd. are affiliates of Respondent Ausenco International Pty Ltd. ("Ausenco").

3.     In my capacity as Commercial Counsel, I participated in the negotiation of the agreement that became memorialized as the Construction Management Agreement dated as of July 13, 2006 (the "CMA").  Prior to the negotiation of the CMA, a related agreement – the Agreement for Engineering Services dated as of January 2, 2006 ("AES") – had also been

negotiated and agreed.  True and correct copies of the CMA and the AES are attached hereto as Exhibits A and B, respectively.

4.    I and others from Ausenco negotiated the CMA with Minefinders. Specifically, our contact at Minefinders was Todd Fayram – a Vice President of Minefinders. Minefinders' headquarters is in Vancouver, British Columbia in Canada.  Mr. Fayram was assisted in the negotiation of the CMA by a Vancouver-based lawyer.

5.    Although Minefinders had its Mexican subsidiary, Compania Minera Dolores S.A. de C.V. ("CMD"), sign the CMA on Minefinders' behalf, Ausenco negotiated the agreement with Minefinders.

6.    During that negotiation, Mr. Fayram made it clear that in the event that Ausenco had a liability to Minefinders, Minefinders needed assurance that Ausenco would have the backing of its parent companies.  This meant that Minefinders needed to be able to bring claims not only against Ausenco – the signatory to the CMA – but also against Ausenco's parent companies.

7.    To that end, Minefinders – not Ausenco, not Ausenco Americas, and not CMD – proposed and insisted upon the inclusion in the CMA of article 1.2(c) (which provides that "reference to the Company includes all related corporate bodies of the Company") and article 1.2(d) (which provides that "reference to the Construction Manager includes all related corporate bodies of the Construction Manager").  In turn, those provisions – articles 1.2(c) and 1.2(d) – made it possible for a dispute to be brought to arbitration pursuant to article 17(d) against a signatory and its related corporate bodies.  Virtually identical provisions had already been agreed to and included in the AES.  The parties understood and intended those provisions in

both agreements to provide similar rights and protections for Ausenco in suits against CMD and its affiliates, including Minefinders.

        8.    A true and correct copy of a letter dated August 1, 2007 from Gregg Bush to Carlos Torres is attached hereto as Exhibit C.

        9.    A true and correct copy of an e-mail dated October 18, 2007 from Gregg Bush to Paul Leach is attached hereto as Exhibit D.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 21, 2008

_____
James Yeates

# EXHIBIT A

<u>CONSTRUCTION MANAGEMENT AGREEMENT</u>

COMPANIA MINERA DOLORES S.A. de C.V.

AND

AUSENCO INTERNATIONAL Pty Ltd.

# CONSTRUCTION MANAGEMENT AGREEMENT

**THIS AGREEMENT** (hereinafter referred to as the "Agreement") made as of this 13th day of July 2006

**BETWEEN**

> **Compania Minera Dolores S.A. de C.V.**
> Lazaro de Baigorri #2
> Parques de San Felipe
> Chihuahua, Chih, 31203 Mexico
>
> ("the Company")

**AND**

> **Ausenco International Pty Ltd.**
> ABN 98 096 016 849
> 2404 Logan Road
> Eight Mile Plains
> Queensland, Australia
>
> (the "Construction Manager")

**WHEREAS**

A.  The Construction Manager is presently providing engineering design services to, and for the benefit of, the Company in connection with the Compania Minera Dolores S.A. de C.V. — Dolores Heap Leach Gold Project (the "Project") pursuant to a Design Services Agreement (the "Design Services Agreement") dated as of the same date as this Construction Management Agreement; and

B.  The Company intends to construct and operate the Project and wishes to engage the Construction Manager to act on the Company's behalf, and in the Company's best interests, to provide construction management services for the Project;

C.  The Construction Manager wishes to serve as the Company's construction manager, and has represented and warranted to the Company that the Construction Manager is experienced in providing construction management services for projects of the size, nature and complexity of the Project and that the Construction Manager's personnel, , and all other persons hired by the Construction Manager have the necessary knowledge, skills and experience to fully and properly perform the services and obligations that are required to be performed by the Construction Manager pursuant to this Agreement; and

D.  The Company and the Construction Manager (hereinafter collectively called the "Parties") wish to formalize the agreement between them with respect to the provision of construction management services; and have executed this Construction Management Agreement based on the foregoing recitals;

2

WITNESSES THAT the Parties, in consideration of their mutual duties and responsibilities to one another as hereinafter set forth, hereby covenant and agree as follows:

**1.**    **DEFINITIONS AND INTERPRETATION**

**1.1.**    **Definitions**

In this Agreement:

"**Additional Services**" means and includes those matters and things the may be required by, and for, the Company that are consistent with the nature of engineering and construction management services typically provided by engineers and construction managers for projects of a like scope and nature.

"**Business Day**" means a day other than Sunday or a statutory holiday in the jurisdiction where the Construction Manager's office is located.

"**Company's Representative**" means the person named Schedule '6' to this Agreement;

"**Company Supplied Equipment and Services**" means the equipment and services described in Schedule "9" to this Agreement.

"**Confidential Information**" means information of any kind acquired in the course of, or incidental to, the performance of the Services or Additional Service by the Construction Manager or its personnel concerning the Company's, business, operations, strategies, transactions, affairs or property and all other information not in the public domain;

"**Construction Manager's Representative**" means the person named in Schedule '6' to this Agreement.

"**Contractor(s)**" means an entity or entities having a direct contract with the Company for the supply of labour, materials or equipment for the Project.

"**Fixed Fee**" is the fee payable to the Construction Manager for fully and properly performing and providing the Services in the amount specified in Article 5.1(c) of this Agreement;

"**Force Majeure Event**" means

(a)    war, whether declared or not, revolution or act of public enemies or terrorism;

(b)    riot or civil commotion;

(c)    any national or state wide strike, lockout or stoppage, work ban, restraint of labour, go-slow or other national or state wide industrial dispute which results in a stoppage of the provision of the Services for more than 5 consecutive days, but excluding any such industrial action which is limited to a Site or only affects the Party claiming force majeure;

(d)    any Act of God;

(e)    fire, flood, storm, tempest, earthquake, volcanic eruptions and washaway; or

3

(f)    any other cause or event, provided that it is not reasonably within the control of the affected Party and provided further that insufficiency of or inability to use funds for any reason cannot constitute a Force Majeure Event.

"**Key Personnel**" mean the Construction Manager's personnel listed in Schedule '3' to this Agreement;"**Overheads**" means 20% of the Personnel Costs;

"**Personnel Costs**" means the cost of the Construction Manager's personnel based on the hourly rates described in Schedule "5" to this Agreement.

"**Project**" means the matters and things for the Compania Minera Dolores S.A. de C.V. – Dolores Heap Leach Gold Project described in Schedule "1" to this Agreement to which the Services apply.

"**Schedule**" means the activities and the time frames for those activities described in Schedule '4' to this Agreement

"**Senior Executives**" means the persons identified as such in Schedule '7' to this Agreement.

"**Staffing Budget**" means the estimate of hours required to be spent by the Construction Manager's personnel in providing and performing the Services as described in Schedule "10" to this Agreement as revised from time to time by the written agreement of the parties.

"**Services**" means the services being provided, and to be provided, pursuant to this Agreement in relation to the Project and specifically includes the duties and coordination responsibilities of the Construction Manager as described herein.

"**Site**" means the site of the Dolores Mine owned by Compania Minera Dolores S.A. de C.V in Chihuahua, Mexico;

"**Work Product**" means all materials in any media, including electronic media prepared or produced by, or at the direction of the Construction Manager, or received by the Construction Manager directly or indirectly in connection with the Project in providing and performing the Services or Additional Services.

**1.2.    Interpretation**

In this Agreement and unless the context indicates a contrary intention:

(a)    reference to any Party includes that Party's executors, administrators, successors, substitutes and assigns, including any person taking by way of novation;

(b)    reference to this Agreement or to any other agreement, deed or document includes, respectively, this Agreement or that other agreement, deed or document as amended, novated, supplemented, varied or replaced from time to time;

(c)    reference to the Company includes all related corporate bodies of the Company;

(d)    reference to the Construction Manager includes all related corporate bodies of the Construction Manager;

4

(e)    words importing the singular include the plural (and vice versa), words denoting a given sex include the other sex, and words denoting individuals include corporations (and vice versa);

(f)    reference to any legislation or to any section or provision of any legislation includes any statutory modification or re-enactment or any statutory provision substituted for it, and ordinances, by-laws, regulations, and other statutory instruments issued under any legislation;

(g)    references to parties, clauses, schedules, exhibits or annexures are references to Parties, clauses, schedules, exhibits and annexures to, or of, this Agreement, and a reference to this Agreement includes any schedule, exhibit and annexure;

(h)    any day appointed or specified by this Agreement for the payment of any money that falls on a day which is not a Business Day will be deemed to be the next Business Day;

(i)    references to payments to any Party to this Agreement will be construed to include payments to another person upon the direction of such Party;

(j)    where a Party executes this Agreement in its capacity as a trustee, a reference to that Party includes any substituted or additional trustee; and

(k)    headings are for convenience only and do not affect interpretation.

## 2.   SERVICES

### 2.1.   Services

The Construction Manager shall provide the Services to, and for the benefit of, the Company in accordance with, and subject to, the terms of this Agreement .

## 3.   ADDITIONAL SERVICES

### 3.1.   Right to require Additional Services

The Company may, from time to time, and at any time, by written notice, require the Construction Manager to provide and perform Additional Services, and the Construction Manager shall forthwith comply with such requirement.

## 4.   CONSTRUCTION MANAGER'S DUTIES AND PERFORMANCE REQUIREMENTS

### 4.1.   Duties of the Construction Manager

The Construction Manager shall:

(a) represent the Company in all matters relating to the construction of the Project;

(b) administer all contracts and proposed contracts with Contractors;

(c) prepare all bid documents, solicit bids, prepare contracts for execution and otherwise assist the Company as required in respect of awarding utilities, electrics and civils for the Project.

(d) comply with all reasonable directions of the Company;

(e) keep detailed records of all matters pertaining to the construction of the Project including minutes of all meetings, site inspections, and other communications and furnish copies of the same to the Company if required by the Company;

(f) keep detailed records of all Services and Additional Services provided and performed and keep daily work sheets which shall include all information necessary for Company to calculate or verify any payments which may be due to the Construction Manager and provide copies of the same to the Company if required by the Company;

(g) at any time and from time to time, provide any reasonable requested information to the Company in connection with the Construction Manager's performance of the Services and Additional Service and in connection with the construction of the Project:

(h) attend all meetings and presentations on behalf of the Company and assist and support the Company in preparing for and attending all meetings at which the Company is otherwise represented;

(i) assist the Company in resolving any dispute arising among the Company and its Contractors; and

(j) review Contractor's application for payment, confirm that the all appropriate back up information, submittals and statutory declarations accompany the Contractor's applications for payment, and recommend to the Company how much is to be paid to any Contractor(s) on a monthly basis.

(a) provide cost reporting of the entire Project including mining and other costs incurred and controlled by the Company; and

(k) provide commissioning assistance for the Project.

**4.2.    Coordination Responsibilities of the Construction Manager**

The Construction Manager shall be responsible for managing and coordinating :

(b) compliance by Contractors with all conditions that may be imposed by any governmental authorities having jurisdiction over the construction of the Project in connection with all approvals and permits;

(c) the construction of the Project in accordance with the designs, drawings and specifications applicable to the Project.

(d) the work of all Contractors for the construction of the Project;

(e) the work of all Contractors so that it is performed in accordance with the Schedule;

(f) all activities on the Site in a manner that is in the best interests of the Company and does not expose the Company to liability, cost or risk;

(g) compliance by Contractors with all directions of the Company;

6

(h) the work for all personnel working or attending at the Site so that it is performed in accordance with the safety plan provided by the Company;

(i) the quality control program and provide quality assurance for the construction of the Project;

(j) the materials handling plan for the Project; and

(k) the preparation of 'as built' drawings by the Contractors.

### 4.3. Key Personnel

In providing and performing the Services, the Construction Manager shall use only personnel to perform the Services and Additional Services who have the required levels of skill, experience, competence and, where necessary, qualifications and without limiting the foregoing shall employ the Key Personnel and shall not change or remove any of the said Key Personnel without the express written agreement of the Company such agreement not to be unreasonably withheld.

### 4.4. Reports

The Construction Manager shall provide the Company with monthly reports detailing the Services and Additional Services provided by the Construction Manager in the preceding month, in a form, and containing information, required by the Company.

### 4.5. Construction Manager's Representations and Warranties

The Construction Manager acknowledges that that Company has made material reliance on the representation and warranties herein provided in engaging the Construction Manager pursuant to this Agreement and the Construction Manager represents and warrants that:

(a) the Construction Manager's personnel and all other persons hired by the Construction Manager to perform the Services and Additional Services are, and will be, competent and have the necessary knowledge, skills and experience to fully and properly perform the Services and Additional Services;

(b) the Services and Additional Services shall be delivered in a planned and logical sequence that is coordinated with the Company's development activities for the Project;

(c) the Services will be performed efficiently and in the most cost effective manner, consistent with any budgets and estimates for the Services and in accordance with the Schedule;

(d) the Services will be performed in accordance with the standard of care and skill exercised by, and expected of, first-rate nationally recognized construction managers in projects that are similar in scope, size, complexity and nature; and

(e) the Services and the Additional Services will, strictly comply with all applicable laws and with enerally prevailing and accepted industry standards and practices in the USA.

7

5.    **PAYMENT FOR SERVICES AND ADDITIONAL SERVICES**

5.1.    **Payment for Services**

The Company, on a monthly basis, and subject to the provision of this Article 5, shall pay the Construction Manager the total of:

(a)    the Personnel Costs; plus

(b)    the Overheads plus

(c)    a pro-rata portion of US$400,000 being the fee payable to the Construction Manager for providing and performing the Services (the "Fixed Fee").

collectively referred to as the "Construction Management Fee"

5.2.    **Monthly Payment**

On the 25th of every month, the Construction Manager shall submit an application for payment on account of the Services indicating:

(a)    an estimate of the Personnel Costs for the following month for Services with reference to the Staffing Budget indicating the Overheads and the pro-rata portion of the Fixed Fee that will be earned; and

(b)    the actual Personnel Cost for the month in which the application for payment in made.

5.3.    **Time for Payment**

Within 7 days of the receipt thereof, the Company, in its sole discretion acting reasonably, may accept the Construction Manager's calculations referenced in Article 5.2(a) above, or revise the same by substituting the Company's own calculations. Not later than 30 days from the date of the Company's receipt of the Construction Manager's application for payment, and all back up information required or requested by the Company, the Company will pay to the Construction Manager, the amount identified by the Construction Manager pursuant to Article 5.2(a) above, or the amount determined by the Company pursuant to this Article 5.3, adjusted as provided in Article 5.4 below

5.4.    **Monthly Adjustments**

The monthly amount payable to the Construction Manager on account of the Construction Management Fee will be adjusted to reflect the actual Personnel Costs for the preceding month so that the payment due to the Construction Manager for the current month will be debited or credited by the amount of any overpayment or underpayment in the preceding month.

5.5.    **Maximum Fixed Fee**

Subject to Article 5.6 below, the total Fixed Fee payable by the Company to the Construction Manager shall not, in any event, exceed the Fixed Fee specified in paragraph Article 5.1(c) of this Agreement.

**5.6.    Changes to the Fixed Fee**

If the Company changes the scope of the Project so that the Staffing Budget is increased or decreased by more than 20% of the estimated Personnel Costs, then the Fixed Fee shall be increased or decreased by a pro-rata amount.

**5.7.    Payment for Additional Services**

Unless agreed otherwise by the parties, payment for Additional Services shall be based on the hourly rates identified in Schedule '5' to this Agreement. The Construction Manager shall apply for payment for Additional Services in the same manner, and at the same times as submitting its applications for payment for the Services and shall name the Construction Manager's personnel providing and performing the said Additional Services. The amount claimed for such Additional Services shall be based on the number of hours expended in providing and performing the same multiplied by the hourly rates identified in Schedule '5' to this Agreement. The said hourly rates represent the entire amount payable to the Construction Manager and there shall be no additional mark-up or burden applied to the said hourly rates.

**5.8.    Method of application for payment**

The Construction Manager shall make all applications for payments via airmail, mail or electronic copy, and shall supply any further information or documentation requested by the Company to support the value of any application for payment

**5.9.    Method of Payment**

All payments made pursuant to this Agreement shall be made by unendorsed bank cheque or other immediately available funds in US Dollars or by such other means as the parties may agree.

**6.    SAFETY**

**6.1.    Compliance by Personnel**

The Construction Manager shall ensure that all persons employed by or under the control of Construction Manager observe and comply with all rules, regulations and directions which may be promulgated or given from time to time by the Company relating to any matter including, but not limited to, the safety of persons and preservation of property and shall ensure that all of the Construction Manager's personnel, and others employed by the Construction Manager for the purposes of providing and performing the Services and Additional Services are aware of, and properly trained in, safety procedures in respect of the Project. All costs incurred in relation to complying with this article shall be paid by the Construction Manager.

9

### 6.2.    Reporting Accidents

The Construction Manager shall immediately report to the Company any accident, injury or dangerous circumstance occurring or arising in the performance of the Services and Additional Services and any damage to the Company's property or to the property or person of any third party and any act, matter or thing which causes such damage loss or injury and the Construction Manager shall permit and shall procure such further permission as may be necessary for the Company or any person nominated by it to make such inspections and interviews and take such statements from the Construction Manager's personnel as the Company shall thinks fit for the purposes of determining the causes and effects of such accidents, injuries or dangerous circumstances.

### 6.3.    Serious Accidents

The scene of serious accidents, as such accidents are defined by the United States of America Mine Safety & Health Administration (MSHA), or any Mexican law, must not be disturbed without the prior approval of the Company and all relevant authorities The Construction Manager shall permit and shall obtain such further permissions as may be necessary for the Company or any person nominated by the Company to make and conduct such inspections and interviews and take such statements from the Construction Manager's personnel and any Sub-consultant and their employees as the Company thinks fit for the purpose of determining the causes and effects of any accident, injury or dangerous circumstances. A full written report detailing the accident itself, its cause and the action taken by Construction Manager to prevent any further occurrence shall be submitted to the Company within twenty-four (24) hours of an accident. The company may direct that additional protective measures be carried out and Construction Manager shall forthwith comply and such direction at its own expense.

### 7.    EQUIPMENT AND SERVICES

### 7.1.    Company Supplied Equipment and Services

The Company shall provide the Construction Manager with the Company Supplied Equipment and Services for the purpose of providing the Services. The equipment must not be used for any other purpose. The Construction Manager shall be responsible for the care and maintenance of such equipment and shall take all steps and measure that are necessary or advisable in order to protect the Company Supplied Equipment and Services from loss or damage. The Construction Manager shall be liable to the Company for any loss of, or damage to, the equipment howsoever caused, except reasonable wear and tear. The Company may deduct the amount of any costs and expenses that the Company incurs as a result of the Construction Manager's failure to care and maintain the Company Supplied Equipment and Services and protect it from loss or damage. The Construction Manager shall return the equipment to the Company upon completion of the Service in the same good working order, repair and condition as such equipment was in at the commencement of the Services, fair wear and tear excepted.

### 7.2.    Construction Manager Supplied Equipment

The Construction Manager shall provide, at its own expense, all equipment necessary to efficiently perform the Services other than the Company Supplied Equipment and Services and shall keep such equipment adequately insured. All such equipment shall be at the risk of the Construction Manager and the Company shall in no event be responsible for loss or damage to the said equipment, howsoever arising.

The Construction Manager must not bring on Site any equipment which is in disrepair or which is not operating according to manufacturers specifications. All such equipment, to the extent reasonable, shall be clearly marked as belonging to the Construction Manager.

## 8.    POLLUTION AND THE ENVIRONMENT

### 8.1.    Awareness

The Construction Manager shall ensure that all persons engaged in performing the Services and Additional Services are fully aware of, and comply with, all laws and other requirements applicable in relation to environment protection and conservation including, without limitation, the Company's Environmental Management Plan as issued from time to time by the Company.

### 8.2.    Existing Flora and Fauna

The Construction Manager shall not cause or permit damage or injury to any existing flora and fauna. Written approval must be obtained before any other flora can be removed, destroyed or damaged.

### 7.3    Local Title and Heritage

The Construction Manager shall not cause or permit damage or destruction of any heritage site and must comply with all laws and other requirements applicable in relation to heritage matters.

## 9.    ACCOMMODATION AND MESSING

### 9.1.    Accommodation and Messing

The Company will provide suitable accommodation and messing for the Construction Manager's personnel when at Site. Subject to availability, and at the Company's discretion, accommodation may also be made available to the Construction Manager's duly authorised visitors.

### 9.2.    Compliance with Rules and Regulations

The Construction Manager will ensure that the Key and other Personnel shall observe all applicable Site rules and regulations issued by the Company from time to time. The Company reserves the right to withdraw accommodation and messing facilities from any person for non-observance of Site rules.

**9.3.    Costs of Damage**

The Company may charge the Construction Manager for the repair of any damage done to Site accommodation buildings or contents which is shown to have been solely caused by the Construction Manager's personnel or duly authorised visitors which charge shall be a debt due to the Company by the Construction Manager and may at the option of the Company be deducted from any amounts owing by the Company to the Construction Manager.

**10.    CONFIDENTIAL INFORMATION**

**10.1.    Non Disclosure Obligations**

The Construction Manager shall not, disclose to any other person any Confidential Information or use any of that information commercially, or for private gain, or in any way not specifically contemplated under this Agreement and authorized by the Company. The Construction Manager shall also ensure that any and all personnel, and others for whom the Construction Manager is responsible do not disclose any Confidential Information or use any of that information commercially or for private gain or in any way not specifically contemplated under this Agreement and authorized by the Company. The Construction Manager shall not, retain copies of any Confidential Information once the Construction Manager no longer requires the said copies of information in order to provide and perform the Services and Additional Services and shall ensure that any and all of the Construction Manager's personnel, and others for whom the Construction Manager is responsible do not retain such copies.. The obligations of the Construction Manager pursuant to this clause shall not apply to:

(a)    any disclosure where the disclosure is required by law. If the Construction Manager decides that the disclosure is required by law, it must immediately notify the Company of the requirement for the information or property to be disclosed. If the Company objects to the disclosure on the basis that it is not required by law, the Construction Manager must do all things requested by the Company to resist such disclosure at the cost of the Company;

(b)    the disclosure is to an officer or employee of the Construction Manager, and is to the extent that he or she needs to know the Confidential Information. The disclosure must only be made on the express condition that the officer or employee is subject to the same obligation of confidentiality as the Construction Manager;

(c)    the disclosure is reasonably made to a professional legal adviser;

(d)    the Confidential Information is already in the public domain, unless it came into the public domain as a result of a breach of confidentiality; and

(e)    the Company consents in writing to the disclosure. The Company's consent may be subject to the condition that the person to whom the disclosure is made enter into a separate confidentiality agreement with the Company;

**10.2.    Survival of Non-disclosure Obligations**

The obligations of the Construction Manager under this clause survive and continue after the termination of this Agreement.

10.3.    **Indemnity and Hold Harmless**.

The Construction Manager shall hold harmless and indemnify the Company from and against any and all claims against the Company or damages assessed against the Company arising out of the unauthorized disclosure of any Confidential Information contrary to the provisions of this Article 10.

11.    **WORK PRODUCT**

11.1.    **Ownership**

The Work Product, and any partially completed portions thereof, shall at all times belong exclusively to the Company. The Company agrees that it will not use the Work Product for any purpose, except for the execution of the Project, without obtaining the Construction Manager's prior agreement, in writing, and equitably remunerating the Construction Manager therefore.

11.2.    **Survival of Ownership Rights**

The Company's rights in respect of the Work Product shall survive any termination of this Agreement.

11.3.    **Delivery of Work Product**

The Construction Manager shall deliver to the Company, upon its request, all Work Product and all copies of any Work Product and all correspondence produced or received on behalf of the Company and all files, notes and office materials received or developed by the Construction Manager with respect to the Services and Additional Services in the possession of the Construction Manager or any employee or agent thereof at any time during the currency of this Agreement and immediately upon termination of this Agreement.

11.4.    **Control and Review of Work Product**

The Company shall at all times have the right to control and review all Work Product and may, from time to time, impose specific requirements and general provisions setting out items which the Construction Manager must submit to the Company for specific review. Such review by the Company shall not affect or diminish in any way, the obligations and liabilities of the Construction Manager with respect to the Services.

11.5.    **Further Acts**

The Construction Manager and Company shall, at any time, and from time to time hereafter at the request of the other execute all such documents and do all such further acts that may be required in order to vest in the Company ownership and control in the Work Product as described in this Article 11.

## 12.    INSURANCE

### 12.1.    Insurance to be Maintained by the Construction Manager

The Construction Manager, at the Construction Manager's expense, shall take out and maintain, in full force and effect, the following policies of insurance:

(a)    a professional liability insurance policy insuring the Construction Manager and those for whom the Construction Manager is responsible, for negligent acts, errors and/or omissions in providing the Services, with a minimum coverage of US$ 5,000,000 per claim and a minimum aggregate coverage under the policy of US$ 5,000,000, to be maintained during the currency of this Agreement and for 60 months following the completion of the Services.

(b)    workers' compensation and any other insurance required by any applicable law in respect of injury or death to the Construction Manager's personnel, and the personnel of persons for whom the Construction Manager is responsible, at the Site and employer's liability/common law insurance in an amount of $5 million in respect of any person employed or engaged by the Construction Manager or deemed to be so employed;

(c)    general third party liability insurance covering the Construction Manager's own operations and legal liabilities, and the operations and legal liabilities of those for whom the Construction Manager is responsible with a minimum coverage of not less than US$5 million for any one occurrence;

(d)    motor vehicle liability insurance (including applicable "gap" coverages for claims in respect of personal injury or death not covered nor able to be covered by the Insurance otherwise referred to in this Article) in respect of all mechanically propelled vehicles supplied and used by the Construction Manager in connection with carrying out the Services and Additional Services with a minimum coverage of US$2 million for any one occurrence;

(e)    any additional insurance required by law;

### 12.2.    Certificate of Currency

If requested by the Company, the Construction Manager shall provide a certificate of currency for the insurance policies required to be maintained by the Construction Manager under this Article 12.

### 12.3.    Company May Effect Insurance

If the Construction Manager fails to effect or keep in force any of the insurances required by this Article 12, the Company may:

(a)    effect and keep such insurances in force and pay such premiums as may be necessary for that purpose and may recover as a debt due and payable from the Construction Manager the amount so paid; and

14

(b)    refuse payment of any amount otherwise due to the Construction Manager until such insurance is obtained by the Construction Manager and policies are made available for inspection by the Company.

## 13.    CONSTRUCTION MANAGER'S INDEMNITY

### 13.1.    Indemnity

The Construction Manager shall bear all risks and liabilities resulting from any and all Services and Additional Services negligently or improperly performed by the Construction Manager or by others for whom the Construction Manager is responsible. The Construction Manager hereby indemnifies the Company and its officers, employees and agents from and against all claims, proceedings, damages liabilities, losses and expenses, including legal costs on a full indemnity basis, arising out of:

(a)    errors, omissions or negligent acts by the Construction Manager or anyone for whom it is responsible in connection with the provision of the Services;

(b)    breach of this Agreement;

(c)    infringement of patents, trade marks, copyright and registered designs; and

(d)    failure by the Construction Manager to comply with any laws, regulations or other legal requirements.

### 13.2.    Exclusion of Company's Actions

The Construction Manager is not liable to indemnify the Company for any liability, loss or expense arising out of any claim or proceeding against the Company to the extent that such claim or proceeding is based on the acts or omission of the Company or persons for whom the Company is responsible.

### 13.3.    Limitation of Liability.

The Construction Manager's liability to the Company in respect of any indemnity provided by the Construction Manager pursuant to this Article 13, shall be limited to US$ 5,000,000 per claim (as that term is defined in the Construction Manager's professional liability insurance policy) and to and aggregate of US$ 5,000,000,. Neither Party shall be liable to the other for any consequential loss or damages or indirect loss, including loss of profits, economic loss, loss of production, loss of contracts, loss of revenue, business interruption or for any special, pecuniary or exemplary loss or damages arising out of or in connection with this Agreement.

## 14.    TERMINATION

### 14.1.    Termination Due to Breach

If either Party to this Agreement (hereinafter referred to as the "Defaulting Party") commits a breach of this Agreement and fails to commence to rectify such breach, if capable of

15

remedy, within 10 days of receiving written notice from the other Party (hereinafter referred to as the "Non-Defaulting Party") specifying the breach, the Non-Defaulting Party may terminate this Agreement forthwith by sending a written notice stating that the Agreement is terminated to the Defaulting Party. The Agreement will be terminated from the date that the written notice of termination is sent to the Defaulting Party.

14.2.    **Termination Due to Unsatisfactory Provision of Services**

If the Company believes the provision of the Services is unsatisfactory, the Company may give the Construction Manager a written notice specifying the problems and requiring the Construction Manager remedy the unsatisfactory performance of the Services within 3 days, or such longer time as may be specified by the Company, the Company may terminate the Agreement by 7 days notice in writing to the Construction Manager.

14.3.    **Termination Because Services No Longer Required**

If the Company reasonably considers that, having regard to its business needs, the Services are no longer required, it may terminate the Agreement by giving 14 days notice in writing to the Construction Manager. The Company shall pay to the Construction Manager all outstanding amounts for the Services and Additional Services up to the date of termination and any other costs or expenses the Construction Manager is legally liable to pay arising directly from the said termination. In no event shall the Company be responsible for lost profits or lost opportunity costs of the Construction Manager, or those for whom the Construction Manager is responsible, attributable, or related, to the said termination.

14.4.    **No Compensation on Termination**

Other than the direct termination costs payable by the Company under Article 14.3 above, the Construction Manager is not entitled to any compensation or payment for the early termination of this Agreement.

14.5.    **Delivery of Property and Records on Termination**

If this Agreement is terminated, the Construction Manager shall immediately deliver to the Company all Work Product and any other supplies, and equipment used by the Construction Manager in the provision of the Services and Additional Services and belonging to the Company and shall keep confidential any copy of any of the documents or records retained by the Consultant including any information on any computer or in any digital or electronic form.

15.    **VALUE ADDED AND WITHHOLDING TAX**

15.1.    **Value Added Tax**

All fees, amounts and hourly rates referred to in this Agreement, are exclusive of, GST, IVA and/or VAT. The Consultant shall indicate any GST, IVA and/or VAT that is payable by the Company, and collectable by the Consultant on the Consultant's applications for payment and the Company shall pay the said taxes in addition to the Design Fee. The

Consultant shall remit all such taxes as required by the any applicable laws or tax authority, and the parties will cooperate with each other with respect to recovery of such taxes or the mitigation of the same.

## 15.2.    Withholding Tax

Payments to the Construction Manager may be subject to withholding tax and the Company shall be entitled to withhold and remit such withholding tax from payments otherwise due to the Construction Manager. The Construction Manager and the Company agree that they will work cooperatively to minimize and recover any withholding tax for the benefit of the Construction Manager.

## 16.    FORCE MAJEURE

### 16.1.    Procedure

If a Force Majeure Event occurs:

(a)    a Party affected by the Force Majeure Event will notify the other Party in writing as soon as practicable of the Force Majeure Event and the extent to which that Party is unable to comply with its obligations;

(b)    the obligations of a Party under this Agreement will be suspended to the extent that it is wholly or partially precluded from complying with its obligations under this Agreement by the Force Majeure Event and the Schedule will be extended by the duration of the suspension;

(c)    the affected Party will, using all reasonable diligence and endeavours, seek to remedy, avoid or overcome the Force Majeure Event as quickly as is practicable and otherwise seek to minimise any delays which may result from the Force Majeure Event; and

(d)    the affected Party will promptly on the cessation of the Force Majeure Event notify the other Party of the cessation and recommence performance of its obligations under this Agreement.

### 16.2.    Effect of Force Majeure

The Parties acknowledge that in the event of an occurrence of a Force Majeure Event that will prevent the Construction Manager from completing the Services in full, then, after 60 days following start of the Force Majeure, either party will be entitled to terminate the Agreement by giving written notice to the other. The Company shall continue to pay the Personnel Costs without any Overheads or Fixed Fee being applied to the same during the said 60 day period. The Company may thereafter have the Services performed by a person other than the Construction Manager. In no event shall the Company be responsible for lost profits or lost opportunity costs of the Construction Manager, or those for whom the Construction Manager is responsible, attributable, or related, to the said termination.

17.    **DISPUTES**

    (a)    If a dispute arises between the Parties arising out of or relating to this Agreement the Party seeking to resolve the dispute must do so strictly in accordance with the provisions of this Article 17. Compliance with the provisions of this Article is a condition precedent to seeking relief in any court or tribunal in respect of the dispute.

    (b)    A Party seeking to resolve the dispute must notify the existence and nature of the dispute to the other Party (hereinafter referred to as the "Notification"). Upon receipt of a Notification the Parties must refer resolution of the dispute to their respective Senior Executives and those Senior Executives will meet within 7 days and use their best endeavours to resolve the dispute by negotiation.

    (c)    If within 30 days of receipt of a Notification, the Parties have been unable to resolve the matter, or to agree a method of resolving the matter, by negotiation, then either Party may commence proceedings in accordance with Article 17(d) below.

    (d)    The Parties agree that any claim or dispute between them or against any agent, employee, successor, or assign of the other, whether related to this Agreement or otherwise, and any claim or dispute related to the Agreement or the relationship or duties contemplated under this contract, including the validity of this arbitration clause, shall be resolved by binding arbitration under the rules of the American Arbitration Association. Any award of the arbitrators may be entered as a judgment in any court having jurisdiction, including remedies for repossession, replevin, foreclosure, or other remedies where property would be subject to reclamation or disposition. In the event a court having jurisdiction finds any portion of this Agreement unenforceable, that portion shall not be effective and the remainder of the Agreement shall remain effective. An arbitrator selected by the claimant and an arbitrator selected by respondent shall, within ten days of their appointment, select a third and neutral arbitrator. In the event that they are unable to do so, the Parties shall agree to an independent third party to appoint the third arbitrator.

    (e)    Expenses and individual legal fees incurred by the Parties in connection with any such arbitration shall be borne by the Parties as determined by the arbitrators.

18.    **NOTICES**

18.1.    **Delivery of Notices**

All notices required or permitted to be given by one Party to another under this Agreement must be in writing, addressed to the other Party and:

    (a)    delivered at that Party's described in Schedule '8' to this Agreement;

    (b)    sent by pre-paid mail to that Party's address; or

    (c)    transmitted electronically to that Party's address.

18.2.   **Receipt of Notices**

A Notice given to a Party in accordance with Article 16.1 is treated as having been duly given and received:

(a)     when delivered (in the case of its being left at that Party's address);

(b)     on the fifth Business Day after posting

(c)     on the day of transmission if a Business Day, otherwise on the next following Business Day (in the case of it being transmitted by facsimile to the facsimile receiver number of the recipient and a correct and complete transmission report for that transmission being received by the sender); or

(d)     if sent by email, upon receipt by the sender of acknowledgment of receipt from the recipient.

19.     **PARTIES' REPRESENTATIVES**

19.1.   **Liaison**

The Construction Manager will liaise with the Company's Representative or any other person notified to the Construction Manager by the Company from time to time for all matters (including instructions, notifications and authorisations) relating to the Services and Additional Services and this Agreement.

19.2.   **Notices**

Notwithstanding the provisions of Article 18, the Company may issue all Notices under this Agreement to the Construction Manager's Representative and the Construction Manager's Representative will act as the Construction Manager's point of contact for all matters to do with this Agreement. The Construction Manager will promptly inform the Company in writing of any replacement of the Construction Manager's Representative.

20.     **CHANGES IN SERVICES**

20.1.   **Changes in Services**

The Company shall, and from time to time, and at any time, be entitled, add to, or delete from, the Services by giving written direction of the same to the Construction Manager. If any modification or deletion of the Services results in a reduction or an increase in the Staffing Budget, then, subject to Article 5.6 of this Agreement, the Fixed Fee shall be increased or decreased by a pro-rata amount.

21.     **MISCELLANEOUS**

21.1.   **No Agency**

The relationship between the Company and the Construction Manager is that of independent contractors and nothing in this Agreement will be construed so as to create a relationship of employment, agency or partnership between the Company and the

Construction Manager (or any of the directors, partners or personnel of the Construction Manager). The Construction Manager does not have any authority to contract with third parties on behalf of the Company or to otherwise bind the Company without the Company's written agreement.

### 21.2. Conflict of Interest

The Construction Manager shall ensure that, it and its personnel, have no conflict of interest preventing them from properly and confidentially performing the Services and Additional Services in accordance with this Agreement. Should a conflict of interest, or a potential conflict of interest, arise, the Construction Manager must immediately advise the Company.

### 21.3. Liability for Sub-consultants

The Construction Manager must not engage any sub-consultant or agent to perform any or all of the Services and Additional Services without the prior consent of the Company. The Construction Manager will ensure that any sub-consultant or agent it engages in connection with this Agreement complies with all applicable terms and conditions of this Agreement. The Construction Manager will indemnify and keep indemnified the Company against any loss or damage arising out of the performance, purported performance or non-performance by any of its ub-consultants or agents.

### 21.4. Entire Agreement

This Agreement constitutes the entire agreement for the performance of the Services and Additional Services and supersedes all previous arrangements, correspondence, representations, proposals, understandings and communications whether written or oral.

### 21.5. Waiver

The non-exercise of, or delay in, exercising any power or right of a Party does not operate as a waiver of that power or right, nor does any single exercise of a power or right preclude any other exercise of it or the exercise of any other power or right. A power or right may only be waived in writing, signed by the Party to be bound by the waiver. A waiver of any breach or non-compliance will not be, and will not be deemed to be, a waiver of any other or subsequent breach or non-compliance.

### 21.6. Severability

Any provision in this Agreement which is invalid or unenforceable in any jurisdiction is to be read down for the purposes of that jurisdiction, if possible, so as to be valid and enforceable, and is otherwise capable of being severed to the extent of the invalidity or unenforceability, without affecting the remaining provisions of this Agreement or the validity or unenforceability of that provision in any other jurisdiction.

### 21.7. Governing Law and Jurisdiction

This Agreement is governed by the laws of the state of New York and the Parties irrevocably submit to the jurisdiction of the courts of the State of New York USA.

### 21.8. Assignment

The Construction Manager may not assign, otherwise transfer or subcontract any part of its rights or obligations under this Agreement.

### 21.9.   Direct Agreement with Lender

If required to do so, the Construction Manager shall enter into a direct agreement with the lenders under the Project financing for the Project stating that:

(1)     the Construction Manager will continue to comply with the terms of this Agreement notwithstanding any assignment of this Agreement to the lender;

(2)     the Construction Manager consents to the assignment of the benefits of this Agreement to the lender by way of security and any subsequent assignment of the benefits of this Agreement by the lender in connection with the with the enforcement of such security;

(3)     the Construction Manager agrees that it will confirm to the lender that the Agreement is in full force and effect and that there are no outstanding defaults under the Agreement;

(4)     the Construction Manager agrees that any notice of any breach of the Agreement that it issues will be contemporaneously issued to the lender and that such lender shall be permitted, but not obligated, to rectify such breach within 10 days of the receipt of such notice; and

(5)     the lender may enforce this Agreement as if the lender was a party thereto; and

such other terms as the lender may reasonably request and are acceptable to the Construction Manager acting reasonably.

### 21.10.   Enurement

This Agreement will be binding upon and operate for the benefit of the parties hereto and their respective successors and permitted assigns.

**EXECUTED BY**     Compania Minera Dolores S.A. de C.V.
in the presence of:

_____                    _____  VICE PRESIDENT
Signature of witness                              Signature of Authorised Representative

Trevor C. Rose, UP Exploration     Todd S. Fanram
Name of witness                                    Name of Authorised Representative

**EXECUTED BY**     Ausenco International Pty Ltd. (ABN 98 096 016 849)
in the presence of:

_____                    _____
Signature of witness                              Signature of Authorised Representative

REBECCA S. GANTNER                    GARY K. GANTNER
Name of witness                                    Name of Authorised Representative

21

## SCHEDULE 1 – PROJECT

The "Project" is defined as follows:

- Leach pad preparation and lining

- Leach pond preparation and lining; solution ponds preparation and lining

- Power plant

- Ancillary Buildings – Truck shop which includes maintenance, fuel station, truck wash, laboratory, warehouse and offices, change house and gate house

- Water Systems: Tatuaca River, Chabacan Reservoir, Amplio Reservoir and old mine and all water systems relating to facilities distribution.

- Electrical Distribution

- Process solution lines and pumps

- Concrete for TNT package

- Concrete for Lyntek package

- Facilities, leach pad and process ponds site preparation

- Plant Roads

- Main Camp for construction and operations

- TNT crusher and stacking system, contract negotiated and awarded by the Company for crusher

- Coordination of Lyntek, Merrill Crowe contract negotiated and placed by the Company

- Coordinate Chabacan water and surface diversion

## SCHEDULE 2 – ADDITIONAL SERVICES

NOT USED

## <u>SCHEDULE 3 – CONSTRUCTION MANAGER'S KEY PERSONNEL</u>

- Carlos Torres
- Benjamin SAEZ
- Enrique Sobrevilla
- Bob Hayes
- Mario Eisenberg
- George Andersen
- Ulises Illerandi
- Chuatemoc Hererra
- Bob Davis
- Steve Ragsdale
- Benjamin Molina
- Richard McRae
- Gary Gantner

## SCHEDULE 4 – SCHEDULE



## SCHEDULE 5–HOURLY RATES FOR CALCULATING MONTHLY PAYMENTS FOR SERVICES AND ADDITIONAL SERVICES

The Services and Additional Services shall be provided at the rates set out below.  These rates  do not include the Construction Manager's Overhead and Fixed Fee,

| | | |
|---|---|---|
| Project Manager | C.Torres | 90/hour |
| Project Control Manager | G. Andersen | 90/hour |
| Site Manager | B. Saenz | 80/hour |
| Resident Engineer | B.Hayes | 80/hour |
| General Superintendent | E. Sobrevilla | 70/hour |
| Project Contracts Manager | M. Eisenberg | 90/hour |
| Elect/Instr. Superintendent | U .Illerandi | 40/hour |
| Mech/PipingSuperintendent | (later) | 40/HOUR |
| Contracts Administrator | (later) | 40/HOUR |
| Material Control | A. Alegria | 20/HOUR |
| Project Controls | B. Molina | 40/HOUR |
| Heap leach Superintendent | B.Davis | 70/hour |
| Mech/Civil/Piping Engineer | C. Hererra | 40/hour |
| Safety and Security Manager | (later) | 40/hour |
| Security Supervisor | (later) | 20/hour |
| safety supervisor | (later) | 20/hour |
| Scheduler | | 20/hour |
| Cost Engineer | (later) | 20/hour |
| Procurement (Mex. City | (later) | 30/HOUR |
| Procurement Tucson | A. Palafox | 50/hour |
| Controls Clerk Tucson | (later) | 20/hour |
| Admintrator Tucson | M. Hawthorne | 22/hour |
| Construction Coordinator | Steve Ragsdale | 70/hour |
| Civil/Structural Consultant | J. Caid | 90/hour |
| Project Sponsor | R. McRae | 150/hour |
| Project Sponsor | G, Gantner | 150/hour |

All hourly rates are in USD.

Subject to the terms of the Agreement, the maximum allowable Overheads on the above hourly rates representing the Construction Manager's administrative overheads and burden shall be 20%

Expenses for travel, accommodation, living allowances, shall be reimbursed at their actual cost plus 5% for administrative overheads

## SCHEDULE 6 – COMPANY / CONSTRUCTION MANAGER'S REPRESENTATIVE

| Company's Representative | Todd S. Fayram<br>General Manager<br>Compania Minera Dolores S.A. de C.V.<br>Lazaro de Baigorri #2<br>Parques de San Felipe<br>Chihuahua, Chih. 31203 Mexico<br>Facsimile: 614-426-6566<br>Email: fayram@minefinders.com |
| --- | --- |

| Consultants Representative | Richard McRae<br>Project Sponsor<br>Ausenco Americas LLC<br>4005 North Flowing Wells Road<br>Tucson, AZ 85705<br>Fax (520) 292 2705<br>E-mail: richard.mcrae@ausenco.com |
| --- | --- |

## SCHEDULE 7 – SENIOR EXECUTIVES

The Senior Executive for the Company is:

**Mark Bailey, President, Minefinders Corporation, Ltd.**

The Senior Executive for the Construction Manager is:

**Gary Gantner, Present, Ausenco Americas**

29

## SCHEDULE 8 – ADDRESS FOR DELIVERY OF NOTICES

| Company's Address | Compania Minera Dolores S.A. de C.V.<br>Lazaro de Baigorri #2<br>Parques de San Felipe<br>Chihuahua, Chih. 31203 Mexico<br>Facsimile:  614-426-6566<br>Email:  fayram@minefinders.com |
|---|---|

| Construction     Manager's<br>Address | 4005 North Flowing Wells Road<br>Tucson, AZ 85705<br>Fax (520) 292 2705<br>E-mail:  richard.mcrae@ausenco.com |
|---|---|

30

## SCHEDULE 9 – COMPANY SUPPLIED EQUIPMENT AND SERVICES AND SERVICES

- Accommodation and Messing
- Vehicles
  (Company supplied vehicles for use off the mine site shall be insured by the Company)
- Office and office supplies including computers, telephones and phone service and furniture
- Internet, fax and communications services
- Specific equipment for Quality Assurance and Quality Control
- Potable water on site
- Safety supplies
- Other things that the Company deems necessary for the construction of the Project

**SCHEDULE 10 – STAFFING BUDGET**

# EXHIBIT B

# AGREEMENT FOR ENGINEERING SERVICES

COMPANIA MINERA DOLORES S.A. de C.V.

AND

AUSENCO AMERICAS LLC

# AGREEMENT FOR ENGINEERING SERVICES

**THIS AGREEMENT** (hereinafter referred to as the "Agreement") made as of this second (2nd) day of January 2006

BETWEEN

>   **Compania Minera Dolores S.A. de C.V.**
>   Lazaro de Baigorri #2
>   Parques de San Felipe
>   Chihuahua, Chih, 31203 Mexico
>
>   ("the Company")

AND

>   **Ausenco Americas LLC**
>   2082 Montane Drive E.
>   Golden, CO 80401 USA
>
>   (the "Consultant")

WHEREAS

A.  The Consultant is presently providing engineering design services to, and for the benefit of, the Company pursuant to an informal letter of intent; and

B.  The Company and the Consultant (hereinafter collectively called the "Parties") wish to formalize the agreement between them with respect to the engineering design services that hitherto have been provided and performed pursuant to the said letter of intent and with respect to the engineering design services remaining to be provided and performed;

**WITNESSES THAT** the Company and the Consultant, in consideration of their mutual duties and responsibilities to one another as hereinafter set forth, hereby covenant and agree as follows:

1.    **DEFINITIONS AND INTERPRETATION**

1.1.    **Definitions**

In this Agreement:

**"Additional Services"** means the services identified as "Additional Services" in Schedule '2' to this Agreement and that are specifically requested and identified as such by the Company in writing.

**"Business Day"** means a day other than Sunday or a statutory holiday in the jurisdiction where the Consultant's office is located.

**"Company's Representative"** means the person named Schedule '6' to this Agreement;

2

"**Confidential Information**" means information of any kind acquired in the course of, or incidental to, the performance of the Services or Additional Service by the Consultant or its personnel or Sub-consultants concerning the Company's, business, operations, strategies, transactions, affairs or property and all other information not in the public domain;

"**Consultant's Representative**" means the person named in Schedule '6' to this Agreement.

"**Fixed Fee**" is the fee payable to the Consultant for fully and properly performing and providing the Services in the amount specified in Article 5.1(c) of this Agreement;

"**Force Majeure Event**" means

(a)     war, whether declared or not, revolution or act of public enemies or terrorism;

(b)     riot or civil commotion;

(c)     any national or state wide strike, lockout or stoppage, work ban, restraint of labour, go-slow or other national or state wide industrial dispute which results in a stoppage of the provision of the Services for more than 5 consecutive days, but excluding any such industrial action which is limited to a Site or only affects the Party claiming force majeure;

(d)     any Act of God;

(e)     fire, flood, storm, tempest, earthquake, volcanic eruptions and washaway; or

(f)     any other cause or event, provided that it is not reasonably within the control of the affected Party and provided further that insufficiency of or inability to use funds for any reason cannot constitute a Force Majeure Event.

"**Key Personnel**" mean the Consultant's personnel listed in Schedule '3' to this Agreement;

"**Personnel Costs**" means the cost of the Consultant's personnel based on the hourly rates described in Schedule "5" to this Agreement.

"**Project means**" the Compania Minera Dolores S.A. de C.V. – Dolores Heap Leach Gold Project

"**Schedule**" means the activities and the time frames for those activities described in Schedule '4' to this Agreement.

"**Senior Executives**" means the persons identified as such in Schedule '7' to this Agreement.

"**Services**" means the services being provided, and to be provided, pursuant to this Agreement as described in Schedule '1' to this Agreement;

"**Site**" means the site of the Dolores Mine owned by Compania Minera Dolores S.A. de C.V in Chihuahua, Mexico;

3

"**Sub-consultant(s)**" means any person or entity engaged by the Consultant, or engaged by consultant's who themselves are engaged by the Consultant in connection with providing and performing the Service.

"**Workplace**" means the Consultants offices wherever located.

"**Work Product**" means all drawings, plans, models, designs, reports, specifications, calculations and other documents and electronic media, and all concepts, products and processes prepared or produced by, or at the direction of the Consultant, directly or indirectly in connection with the Project or otherwise developed or first reduced to practice by the Consultant in providing and performing the Services or Additional Services.

### 1.2. Interpretation

In this Agreement and unless the context indicates a contrary intention:

(a)  reference to any Party includes that Party's executors, administrators, successors, substitutes and assigns, including any person taking by way of novation;

(b)  reference to this Agreement or to any other agreement, deed or document includes, respectively, this Agreement or that other agreement, deed or document as amended, novated, supplemented, varied or replaced from time to time;

(c)  reference to the Company includes all related corporate bodies of the Company;

(d)  reference to the Consultant includes all related corporate bodies of the Consultant;

(e)  words importing the singular include the plural (and vice versa), words denoting a given sex include the other sex, and words denoting individuals include corporations (and vice versa);

(f)  reference to any legislation or to any section or provision of any legislation includes any statutory modification or re-enactment or any statutory provision substituted for it, and ordinances, by-laws, regulations, and other statutory instruments issued under any legislation;

(g)  references to parties, clauses, schedules, exhibits or annexures are references to Parties, clauses, schedules, exhibits and annexures to, or of, this Agreement, and a reference to this Agreement includes any schedule, exhibit and annexure;

(h)  any day appointed or specified by this Agreement for the payment of any money that falls on a day which is not a Business Day will be deemed to be the next Business Day;

(i)  references to payments to any Party to this Agreement will be construed to include payments to another person upon the direction of such Party;

(j)  where a Party executes this Agreement in its capacity as a trustee, a reference to that Party includes any substituted or additional trustee; and

(k)  headings are for convenience only and do not affect interpretation.

## 2.    SERVICES

### 2.1.    Services

The Consultant shall provide the Services to, and for the benefit of, the Company in accordance with, and subject to, the terms of this Agreement .

## 3.    ADDITIONAL SERVICES

### 3.1.    Right to require Additional Services

The Company may, from time to time, and at any time, by written notice, require the Consultant to provide and perform Additional Services, and the Consultant shall forthwith comply with such requirement.

## 4.    OBLIGATIONS OF THE CONSULTANT

### 4.1.    Performance Requirements

The Consultant will provide and perform the Services and Additional Services, and shall cause any and all Sub-consultants to provide and perform the Services and Additional Services, so that they are:

(a)    delivered in a planned and logical sequence that is coordinated with the Company's development activities for the Project;

(b)    performed in accordance with the Schedule, and otherwise in a timely way having regard to the Company's development schedule for the Project; and

(c)    performed economically and in the most cost effective manner.

### 4.2.    Design Requirements

The designs produced in the performance of the Services and Additional Services shall:

(a)    be economical in all respects including the construction and maintenance of all components of the Project;

(b)    incorporate products and materials that are selected using care and diligence and are appropriate and suitable for their intended use;

(c)    consider, and give effect to, the letter and intent of building codes and other statutory controls governing the Project and without limiting the generality of the foregoing, comply with all laws and regulations applicable to the Project including all environmental laws and regulations, Mexican World Bank  standards and standards set by the Company;

(d)    comply with the requirements of, and not do anything that may cause the Company to be in breach of, any local title agreements; and

(e)    avoid damage or destruction of any heritage site and comply with all laws and other requirements applicable in relation to heritage matters.

## 4.3.    Conduct Requirements

In providing and performing the Services, the Consultant shall:

(a)    to the greatest extent possible, endeavour to avoid changes to the designs that affect or may affect the timely and economical development and construction of the Project.

(b)    act in a skilful, diligent, workmanlike, careful, safe and proper manner;

(c)    act in accordance with any applicable laws, regulations, by-laws and orders;

(d)    act in accordance with standards and practices normally exercised by a professional in the performance of the same or similar services in the same or similar industry;

(e)    use only personnel to perform the Services and Additional Services who have the required levels of skill, experience, competence and, where necessary, qualifications;

(f)    obtain and maintain at its cost all approvals, permits and licences necessary or desirable for it and each of its personnel to perform the Services;

(g)    comply with all reasonable directions and policies of the Company;

(h)    provide information to the Company upon request, as to the manner and timing of the performance of the Services;

(i)    coordinate its work with any other consultants or contractors, and not delay or interfere with such other consultant's or contractor's work;

(j)    provide a safe system of work for all personnel;

(k)    comply with all the Company's rules and regulations from time to time governing health, safety and the environment in carrying out the Services and Additional Services together with all Company rules regarding conduct generally, including, without limitation, the requirement for all personnel to participate in alcohol and drug testing procedures; and

(l)    keep detailed records of all Services and Additional Services provided and performed by the Consultant and keep daily work sheets which shall include all information necessary for Company to calculate or verify any payments which may be due to the Consultant, or which may have been made to the Consultant for Services.

### 4.4. Key Personnel

In providing and performing the Services, the Consultant shall employ the Key Personnel and shall not change or remove any of the said Key Personnel without the express written agreement of the Company such agreement not to be unreasonably withheld.

### 4.5. Schedule

The Consultant shall have regard to, and comply with, the Schedule in providing and performing the Services. In the event that the Consultant fails, or is failing, to maintain the Schedule, the Consultant shall, at its own expense, accelerate the performance of the Consultant's work and the work of its Sub-consultants so that the Schedule is maintained, at all times.

### 4.6. Reports

The Consultant shall provide the Company with monthly reports detailing the Services and Additional Services provided by the Consultant and its Sub-consultants in the preceding month, in a form, and containing information, required by the Company..

### 4.7. Consultant's Representations and Warranties

The Consultant represents and warrants that the Consultant's personnel, Sub-consultants, and all other persons hired by the Consultant to perform the Services and Additional Services are, and will be, competent and have the necessary knowledge, skills and experience to fully and properly perform the Services and Additional Services. The Consultant further warrants and represents that it is able to, and shall, provide the Services and the Additional Services in accordance with the requirements of the whole of Article 4 and acknowledges that that Company has made material reliance on this representation and warranties in engaging the Consultant pursuant to this Agreement.

## 5. PAYMENT FOR SERVICES

### 5.1. Payment for Services

The Company, on a monthly basis, and subject to the provision of this Article 5, shall pay the Consultant the total of:

    (a) the Personnel Costs; plus

    (b) a pro-rata portion of US$ 200,000 being the fee payable to the Consultant for providing and performing the Services (the "Fixed Fee").

collectively referred to as the "Design Fee"

### 5.2. Monthly Payment

On the 25th of every month, the Consultant shall submit an application for payment on account of the Design Fee indicating:

(a)    an estimate of the Personnel Costs for the following month for Services indicating the Overheads and the pro-rata portion of the Fixed Fee that will be earned; and

(c)    the actual Personnel Cost for the month in which the application for payment in made .

**5.3.    Time for Payment**

Within 7 days of the receipt thereof, the Company, in its sole discretion acting reasonably, may accept the Consultant's calculations referenced in Article 5.2(a) above, or revise the same by substituting the Company's own calculations. Not later than 30 days from the date of the Company's receipt of the Consultant's application for payment, and all back up information required or requested by the Company, the Company will pay to the Consultant, the amount identified by the Consultant pursuant to Article 5.2(a) above, or the amount determined by the Company pursuant to this Article 5.3, adjusted as provided in Article 5.4 below

**5.4.    Monthly Adjustments**

The monthly amount payable to the Consultant on account of the Design Fee will be adjusted to reflect the actual Personnel Costs for the preceding month so that the payment due to the Consultant for the current month will be debited or credited by the amount of any overpayment or underpayment in the preceding month.

**5.5.    Maximum Fixed Fee**

The total Fixed Fee payable by the Company to the Consultant shall not, in any event, exceed the Fixed Fee specified in paragraph Article 5.1(c) of this Agreement.

**5.6.    Payment for Additional Services**

Unless agreed otherwise by the parties, payment for Additional Services shall be based on the hourly rates identified in Schedule "5" to this Agreement and the hourly rates identified in Schedule 2 of this Agreement, The Consultant shall apply for payment for Additional Services in the same manner, and at the same times as submitting its applications for payment for the Services and shall   name the Consultant's personnel providing and performing the said Additional Services. The amount claimed for such Additional Services shall be based on the number of hours expended in providing and performing the same multiplied by the   hourly rates identified in Schedule '5'and/or Schedule "2" to this Agreement. The said hourly rates represent the entire amount payable to the Consultant and there shall be no additional mark-up or burden applied to the said hourly rates.

**5.7.    Method of application for payment**

The Consultant shall make all applications for payments via airmail, mail or electronic copy, and shall supply any further information or documentation requested by the Company to support the value of any application for payment

**5.8.    Method of Payment**

All payments made pursuant to this Agreement shall be made by unendorsed bank cheque or other immediately available funds in US Dollars or by such other means as the parties may agree.

**6.    SAFETY**

**6.1.    Compliance by Personnel**

The Consultant shall ensure that all persons employed by or under the control of Consultant, including Sub-consultants, observe and comply with all rules, regulations and directions which may be promulgated or given from time to time by the Company relating to any matter including, but not limited to, the safety of persons and preservation of property and shall ensure that all of the Consultant's personnel, Sub-consultants and others employed by the Consultant for the purposes of providing and performing the Services and Additional Services are aware of, and properly trained in, safety procedures in respect of the Project. All costs incurred in relation to complying with this article shall be paid by the Consultant.

**6.2.    Reporting Accidents**

The Consultant shall immediately report to the Company any accident, injury or dangerous circumstance occurring or arising in the performance of the Services and Additional Services and any damage to the Company's property or to the property or person of any third party and any act, matter or thing which causes such damage loss or injury and the Consultant shall permit and shall procure such further permission as may be necessary for the Company or any person nominated by it to make such inspections and interviews and take such statements from the Consultant's personnel and Sub-consultants as the Company shall thinks fit for the purposes of determining the causes and effects of such accidents, injuries or dangerous circumstances.

**6.3.    Serious Accidents**

The scene of serious accidents, as such accidents are defined by the United States of America Mine Safety & Health Administration (MSHA), must not be disturbed without the prior approval of the Company and all relevant authorities The Consultant shall permit and shall obtain such further permissions as may be necessary for the Company or any person nominated by the Company to make and conduct such inspections and interviews and take such statements from the Consultant's personnel and any Sub-consultant and their employees as the Company thinks fit for the purpose of determining the causes and effects of any accident, injury or dangerous circumstances. A full written report detailing the accident itself, its cause and the action taken by Consultant to prevent any further occurrence shall be submitted to the Company within twenty-four (24) hours of an accident, The company may direct that additional protective measures be carried out and Consultant shall forthwith comply and such direction at its own expense.

9

7. **POLLUTION AND THE ENVIRONMENT**

7.1. **Awareness**

The Consultant shall ensure that all persons engaged in performing the Services and Additional Services are fully aware of, and comply with, all laws and other requirements applicable in relation to environment protection and conservation including, without limitation, the Company's Environmental Management Plan as issued from time to time by the Company.

8. **CONFIDENTIAL INFORMATION**

8.1. **Non Disclosure Obligations**

The Consultant shall not, disclose to any other person any Confidential Information or use any of that information commercially, or for private gain, or in any way not specifically contemplated under this Agreement and authorized by the Company. The Consultant shall also ensure that any and all personnel, Sub-consultants and others for whom the Consultant is responsible do not disclose any Confidential Information or use any of that information commercially or for private gain or in any way not specifically contemplated under this Agreement and authorized by the Company. The Consultant shall not, retain copies of any Confidential Information once the Consultant no longer requires the said copies of information in order to provide and perform the Services and Additional Services and shall ensure that any and all of the Consultant's personnel, Sub-consultants and others for whom the Consultant is responsible do not retain such copies.. The obligations of the Consultant pursuant to this clause shall not apply to:

(a) any disclosure where the disclosure is required by law. If the Consultant decides that the disclosure is required by law, it must immediately notify the Company of the requirement for the information or property to be disclosed. If the Company objects to the disclosure on the basis that it is not required by law, the Consultant must do all things requested by the Company to resist such disclosure at the cost of the Company;

(b) the disclosure is to an officer or employee of the Consultant, and is to the extent that he or she needs to know the Confidential Information. The disclosure must only be made on the express condition that the officer or employee is subject to the same obligation of confidentiality as the Consultant;

(c) the disclosure is reasonably made to a professional legal adviser;

(d) the Confidential Information is already in the public domain, unless it came into the public domain as a result of a breach of confidentiality; and

(e) the Company consents in writing to the disclosure. The Company's consent may be subject to the condition that the person to whom the disclosure is made enter into a separate confidentiality agreement with the Company;

**8.2.  Survival of Non-disclosure Obligations**

The obligations of the Consultant under this clause survive and continue after the termination of this Agreement.

**8.3.  Indemnity and Hold Harmless**

The Consultant shall hold harmless and indemnify the Company from and against any and all claims against the Company or damages assessed against the Company arising out of the unauthorized disclosure of any Confidential Information contrary to the provisions of this Article 8.

**9.    WORK PRODUCT**

**9.1.  Ownership**

The Work Product, and any partially completed portions thereof, shall at all times belong exclusively to the Company. The Company agrees that it will not use the Work Product for any purpose, except for the execution of the Project, without obtaining the Consultant's prior agreement, in writing, and equitably remunerating the Consultant therefore.

**9.2.  Survival of Ownership Rights**

The Company's rights in respect of the Work Product shall survive any termination of this Agreement.

**9.3.  Delivery of Work Product**

The Consultant shall deliver to the Company, upon its request, all Work Product and all copies of any Work Product and all correspondence produced or received on behalf of the Company and all files, notes and office materials received or developed by the Consultant with respect to the Services and Additional Services in the possession of the Consultant or any employee or agent thereof at any time during the currency of this Agreement and immediately upon termination of this Agreement.

**9.4.  Control and Review of Work Product**

The Company shall at all times have the right to control and review all Work Product and may, from time to time, impose specific requirements and general provisions setting out items which the Consultant must submit to the Company for specific review. Such review by the Company shall not affect or diminish in any way, the obligations and liabilities of the Consultant with respect to the Services.

**9.5.  Further Acts**

The Consultant and Company shall, at any time, and from time to time hereafter at the request of the other execute all such documents and do all such further acts that may be

11

required in order to vest in the Company ownership and control in the Work Product as described in this Article 9.

## 10.   INSURANCE

### 10.1.   Insurance to be Maintained by the Consultant

The Consultant, at the Consultant's expense, shall take out and maintain, in full force and effect, the following policies of insurance:

(a)     a professional liability insurance policy insuring the Consultant and those for whom the Consultant is responsible, for negligent acts, errors and/or omissions in providing the Construction Management Services, with a minimum coverage of US$ 5,000,000 per claim and a minimum aggregate coverage under the policy of US$ 5,000,000, to be maintained during the currency of this Agreement and for 60 months following the completion of the Services; and

(b)     any additional insurance required by law;

### 10.2.   Certificate of Currency

If requested by the Company, the Consultant shall provide a certificate of currency for the insurance policies required to be maintained by the Consultant under this Article 10.

### 10.3.   Company May Effect Insurance

If the Consultant fails to effect or keep in force any of the insurances required by this Article 10, the Company may:

(a)     effect and keep such insurances in force and pay such premiums as may be necessary for that purpose and may recover as a debt due and payable from the Consultant the amount so paid; and

(b)     refuse payment of any amount otherwise due to the Consultant until such insurance is obtained by the Consultant and policies are made available for inspection by the Company.

## 11.   CONSULTANT'S INDEMNITY

### 11.1.   Indemnity

The Consultant shall bear all risks and liabilities resulting from any and all Construction Management Services and Additional Services negligently or improperly performed by the Consultant or by others for whom the Consultant is responsible. The Consultant hereby indemnifies the Company and its officers, employees and agents from and against all claims, proceedings, damages liabilities, losses and expenses, including legal costs on a full indemnity basis, arising out of:

(a)   errors, omissions or negligent acts by the Consultant or anyone for whom it is responsible in connection with the provision of the Construction Management Services;

(b)   breach of this Agreement;

(c)   infringement of patents, trade marks, copyright and registered designs; and

(d)   failure by the Consultant to comply with any laws, regulations or other legal requirements.

**11.2.   Exclusion of Company's Actions**

The Consultant is not liable to indemnify the Company for any liability, loss or expense arising out of any claim or proceeding against the Company to the extent that such claim or proceeding is based on the acts or omission of the Company or persons for whom the Company is responsible.

**11.3.   Limitation of Liability.**

The Consultant's liability to the Company in respect of any indemnity provided by the Consultant pursuant to this Article 11, shall be limited to US$ 5,000,000 per claim (as that term is defined in the Consultant's professional liabilty insurance policy) and to an aggregate of US$ 5,000,000,.   Neither Party shall be liable to the other for any consequential loss or damages or indirect loss, including loss of profits, economic loss, loss of production, loss of contracts, loss of revenue, business interruption or for any special, pecuniary or exemplary loss or damages arising out of or in connection with this Agreement.

**12.   TERMINATION**

**12.1.   Termination Due to Breach**

If either Party to this Agreement (hereinafter referred to as the "Defaulting Party") commits a breach of this Agreement and fails to commence to rectify such breach, if capable of remedy, within 10 days of receiving written notice from the other Party (hereinafter referred to as the "Non-Defaulting Party") specifying the breach, the Non-Defaulting Party may terminate this Agreement forthwith by sending a written notice stating that the Agreement is terminated to the Defaulting Party.   The Agreement will be terminated from the date that the written notice of termination is sent to the Defaulting Party.

**12.2.   Termination Due to Unsatisfactory Provision of Services**

If the Company believes the provision of the Services is unsatisfactory, the Company may give the Consultant a written notice specifying the problems and requiring the Consultant remedy the unsatisfactory performance of the Services within a specified time.   If the Consultant fails to do so, the Company may terminate the Agreement by 7 days notice in writing to the Consultant.

**12.3.    Termination Because Services No Longer Required**

If the Company reasonably considers that, having regard to its business needs, the Services are no longer required, it may terminate the Agreement by giving 14 days notice in writing to the Consultant. The Company shall pay to the Consultant all outstanding amounts for the Services and Additional Services up to the date of termination and any other costs or expenses the Consultant is legally liable to pay arising directly from the said termination provided that, in no event, shall the Company be responsible for lost profits or lost opportunity costs of the Consultant, or those for whom the Consultant is responsible, attributable, or related, to the said termination.

**12.4.    No Compensation on Termination**

Other than the direct termination costs payable by the Company under Article 12.3 above, the Consultant is not entitled to any compensation or payment for the early termination of this Agreement.

**12.5.    Delivery of Property and Records on Termination**

If this Agreement is terminated, the Consultant shall immediately deliver to the Company all Work Product and any other supplies, and equipment used by the Consultant in the provision of the Services and Additional Services and belonging to the Company and shall keep confidential any copy of any of the documents or records retained by the Consultant including any information on any computer or in any digital or electronic form.

**13.    VALUE ADDED AND WITHHOLDING TAX**

**13.1.    Value Added**

All fees, amounts and hourly rates referred to in this Agreement, are exclusive of, GST, IVA and/or VAT. The Consultant shall indicate any GST, IVA and/or VAT that is payable by the Company, and collectable by the Consultant on the Consultant's applications for payment and the Company shall pay the said taxes in addition to the Design Fee. The Consultant shall remit all such taxes as required by the any applicable laws or tax authority, and the parties will cooperate with each other with respect to recovery of such taxes or the mitigation of the same.

**13.2.    Withholding Tax**

Payments to the Consultant may be subject to withholding tax and the Company shall be entitled to withhold and remit such withholding tax from payments otherwise due to the Consultant. The Consultant and the Company agree that they will work cooperatively to minimize and recover any withholding tax for the benefit of the Consultant.

14.    **FORCE MAJEURE**

14.1.    **Procedure**

If a Force Majeure Event occurs:

(a)    a Party affected by the Force Majeure Event will notify the other Party in writing as soon as practicable of the Force Majeure Event and the extent to which that Party is unable to comply with its obligations;

(b)    the obligations of a Party under this Agreement will be suspended to the extent that it is wholly or partially precluded from complying with its obligations under this Agreement by the Force Majeure Event;

(c)    the affected Party will, using all reasonable diligence and endeavours, seek to remedy, avoid or overcome the Force Majeure Event as quickly as is practicable and otherwise seek to minimise any delays which may result from the Force Majeure Event; and

(d)    the affected Party will promptly on the cessation of the Force Majeure Event notify the other Party of the cessation and recommence performance of its obligations under this Agreement.

14.2.    **Effect of Force Majeure**

The Parties acknowledge that in the event of an occurrence of a Force Majeure Event that will prevent the Consultant from completing the Services in full, then, after 60 days following start of the Force Majeure, either party will be entitled to terminate the Agreement by giving written notice to the other. The Company shall continue to pay the Personnel Costs without any Overheads or Fixed Fee being applied to the same during the said 60 day period. The Company may thereafter have the Services performed by a person other than the Consultant. In no event shall the Company be responsible for lost profits or lost opportunity costs of the Consultant, or those for whom the Consultant is responsible, attributable, or related, to the said termination.

15.    **DISPUTES**

(a)    If a dispute arises between the Parties arising out of or relating to this Agreement the Party seeking to resolve the dispute must do so strictly in accordance with the provisions of this  Article 15. Compliance with the provisions of this article is a condition precedent to seeking relief in any court or tribunal in respect of the dispute.

(b)    A Party seeking to resolve the dispute must notify the existence and nature of the dispute to the other Party (hereinafter referred to as the "Notification"). Upon receipt of a Notification the Parties must refer resolution of the dispute to their respective Senior Executives and those Senior Executives will meet within 7 days and use their best endeavours to resolve the dispute by negotiation.

(c) If within 30 days of receipt of a Notification, the Parties have been unable to resolve the matter, or to agree a method of resolving the matter, by negotiation, then either Party may commence proceedings in accordance with Article 16(d) below.

(d) The Parties agree that any claim or dispute between them or against any agent, employee, successor, or assign of the other, whether related to this Agreement or otherwise, and any claim or dispute related to the Agreement or the relationship or duties contemplated under this contract, including the validity of this arbitration clause, shall be resolved by binding arbitration under the rules of the American Arbitration Association. Any award of the arbitrators may be entered as a judgment in any court having jurisdiction, including remedies for repossession, replevin, foreclosure, or other remedies where property would be subject to reclamation or disposition. In the event a court having jurisdiction finds any portion of this Agreement unenforceable, that portion shall not be effective and the remainder of the Agreement shall remain effective. An arbitrator selected by the claimant and an arbitrator selected by respondent shall, within ten days of their appointment, select a third and neutral arbitrator. In the event that they are unable to do so, the Parties shall agree to an independent third party to appoint the third arbitrator.

(e) Expenses and individual legal fees incurred by the Parties in connection with any such arbitration shall be borne by the Parties as determined by the arbitrators.

## 16. NOTICES

### 16.1. Delivery of Notices

All notices required or permitted to be given by one Party to another under this Agreement must be in writing, addressed to the other Party and:

(a) delivered at that Party's described in Schedule '8' to this Agreement;

(b) sent by pre-paid mail to that Party's address; or

(c) transmitted electronically to that Party's address.

### 16.2. Receipt of Notices

A Notice given to a Party in accordance with Article 16.1 is treated as having been duly given and received:

(a) when delivered (in the case of its being left at that Party's address);

(b) on the fifth Business Day after posting

(c) on the day of transmission if a Business Day, otherwise on the next following Business Day (in the case of it being transmitted by facsimile to the facsimile receiver number of the recipient and a correct and complete transmission report for that transmission being received by the sender); or

(d)    if sent by email, upon receipt by the sender of acknowledgment of receipt from the recipient.

## 17.    PARTIES' REPRESENTATIVES

### 17.1.    Liaison

The Consultant will liaise with the Company's Representative or any other person notified to the Consultant by the Company from time to time for all matters (including instructions, notifications and authorisations) relating to the Services and Additional Services and this Agreement.

### 17.2.    Notices

Notwithstanding the provisions of Article 16, the Company may issue all Notices under this Agreement to the Consultant's Representative and the Consultant's Representative will act as the Consultant's point of contact for all matters to do with this Agreement. The Consultant will promptly inform the Company in writing of any replacement of the Consultant's Representative.

## 18.    CHANGES IN SERVICES

### 18.1.    Changes in Services

The Company shall, and from time to time, and at any time, be entitled, add to, or delete from, the Services by giving written direction of the same to the Consultant.

## 19.    MISCELLANEOUS

### 19.1.    Independent Contractual Relationship

The relationship between the Company and the Consultant is that of independent contractors and nothing in this Agreement will be construed so as to create a relationship of employment, agency or partnership between the Company and the Consultant (or any of the directors, partners or personnel of the Consultant). The Consultant does not have any authority to contract with third parties on behalf of the Company or to otherwise bind the Company without the Company's written agreement.

### 19.2.    Conflict of Interest

The Consultant shall ensure that, it and its personnel, have no conflict of interest preventing them from properly and confidentially performing the Services and Additional Services in accordance with this Agreement. Should a conflict of interest, or a potential conflict of interest, arise, the Consultant must immediately advise the Company.

### 19.3.    Liability for Sub-consultants

17

The Consultant must not engage any Sub-consultant or agent to perform any or all of the Services and Additional Services without the prior consent of the Company. The Consultant will ensure that any Sub-consultant or agent it engages in connection with this Agreement complies with all applicable terms and conditions of this Agreement. The Consultant will indemnify and keep indemnified the Company against any loss or damage arising out of the performance, purported performance or non-performance by any of its Sub-consultants or agents.

### 19.4.  Assignment

The Consultant may not assign, otherwise transfer or subcontract any part of its rights or obligations under this Agreement, without the prior written consent of the Company which consent may be withheld in the sole and unfettered discretion of the Company.

### 19.5.  Entire Agreement

This Agreement constitutes the entire agreement for the performance of the Services and Additional Services and supersedes all previous arrangements, correspondence, representations, proposals, understandings and communications whether written or oral.

### 19.6.  Waiver

The non-exercise of, or delay in, exercising any power or right of a Party does not operate as a waiver of that power or right, nor does any single exercise of a power or right preclude any other exercise of it or the exercise of any other power or right. A power or right may only be waived in writing, signed by the Party to be bound by the waiver. A waiver of any breach or non-compliance will not be, and will not be deemed to be, a waiver of any other or subsequent breach or non-compliance.

### 19.7.  Severability

Any provision in this Agreement which is invalid or unenforceable in any jurisdiction is to be read down for the purposes of that jurisdiction, if possible, so as to be valid and enforceable, and is otherwise capable of being severed to the extent of the invalidity or unenforceability, without affecting the remaining provisions of this Agreement or the validity or unenforceability of that provision in any other jurisdiction.

### 19.8.  Governing Law and Jurisdiction

This Agreement is governed by the laws of the state of New York and the Parties irrevocably submit to the jurisdiction of the courts of the State of New York USA.

### 19.9.  Enurement

This Agreement will be binding upon and operate for the benefit of the parties hereto and their respective successors and permitted assigns.

EXECUTED AS AN AGREEMENT

**EXECUTED BY**     Compania Minera Dolores S.A. de C.V.
in the presence of:

_____          _____
Signature of witness                             Signature of Authorised Representative

_____          _____
Name of witness     TEREN C. POGE          Name of Authorised Representative     Todd S. Fairram

**EXECUTED BY**     Ausenco Americas LLC
in the presence of:

_____          _____
Signature of witness                             Signature of Authorised Representative

_____          _____
Name of witness     REBECCA S. GANTNER     Name of Authorised Representative     GARY K. GANTNER

## SCHEDULE 1 -- SERVICES

The Service to be provided and performed by the Consultant pursuant to this Agreement are full engineering design, some procurement and project management services required to complete the detailed engineering for those portions of the Dolores Project, which are not otherwise covered under packages awarded by the Company to others.   The packages include the development and tie in of the following:

- Electrical System including generator and switch gear design, transmission and tie-in to all engineering packages.

- Process Water System including design of pumping system and piping for both barren and pregnant solution system.  Coordinate with Merrill Crowe package vendor for tie-in of all process water electrical to plant facilities.

- Potable Water System

- Fire Water System

- All site excavation to include construction of the Primary Crusher support wall.

- All site concrete development and design to include design of concrete from all engineering packages.

- All site road construction.

- All office/maintenance building design.

- All temporary and permanent camp design.

- All new village design.

- Develop all contracts associated to the above items.

- Other items as required for proper operation of the Project.

At this time the engineering for the crushing and conveying, Merrill Crowe and heap leach facilities are underway and will be provided by others. However, the Consultant will coordinate such activities, being provided by others, on behalf of the Company.

The mine development and procurement of the mine equipment is excluded from the Consultants scope of the Consultant's Services, however the Consultant will include the cost and schedule information pertaining to the mine equipment within the Project control reports, if required by the Company.

Tasks and deliverables associated with Services considered within the Consultant's Scope of Work include but are not limited to:

- Detail design and engineering detail drawings, criteria and specifications

- Identification of long lead equipment and material items

20

- Purchase of vendor data, if determined necessary for equipment that is an integral part of the design

- Preparation of a procurement plan for purchasing of project equipment and material within the consultants scope of work and supply.

- Close coordination of the suppliers of packaged systems

- Assisting the Company in reviewing and updating project estimates being prepared by other under the Company's direction. The Company may elect to have Consultant make such estimates at additional cost.

- Development of Project control cost report ,schedules and basis of progress reports for the total Project that are based on the completed updated estimate  the  higher level of engineering, procurement and design scheduled to be performed by the Consultant and the package engineering providers.

- Development of the Scope of Work for the next phase of Procurement and Construction

## SCHEDULE 2 – ADDITIONAL SERVICES

To allow the project to comply with critical schedule objectives certain Additional Services may be reequired, pending the execution of a Construction Management Agreement between the Company and the Consultant for the same. These Additional Sctivities will consist of but be limited to the following:

**Additional Services**

- Award of the contract for the design , supply and installation of the man camp
- Award of long lead delivery items and specifically, the diesel generators.
- Award of the critical construction contracts, specifically, that for site preparation
- Planning for construction mobilization.

The Consultant will recommend to the Company any other Additional Services that the Consultant identifies ought to be provided or performed pending the xecution of the Construction Management Agreement.

## HOURLY RATES FOR ADDITIONAL SERVICES

The project personnel required for the Additional Services will consist of certain of the project personnel listed on Schedule 5 to this Agreement, and the following additional personnel:

- Benjamin Saenz ( Site Manager)                        $80/hour
- Enrique Sobrevilla (Construction Superintendent)       $70/hour
- Steve Ragsdale (Construction Coordinator)              $70/hour
- George Andersen (Project Control Manager)              $90/hour

The foregoing hourly rates are provided on the same basis as those in Schedule "5" to this Agreement, that is, without mark-up for administrative overheads and without inclusion of the Consultant's Fixed Fee.

## SCHEDULE 3 – CONSULTANT'S KEY PERSONNEL

Carlos Torres

Brad McLean

Mario Eisenberg

## SCHEDULE 4 – SCHEDULE

Commence providing and performing the Services on **January 2, 2006**

Complete the Services on **July 30, 2006**

## SCHEDULE 5– RATES FOR HOURLY RATES FOR CALCULATING MONTHLY PAYMENTS FOR SERVICES AND ADDITIONAL SERVICES

Services and Additional Service shall be provided at the rates set out below.

Labor Rates are fixed rates and shall not be marked-up by the Consultant.

All rates are in USD):

- Carlos Torres (Project / Engineering Manager)           90 / hour
- Tim Hawthorne (Consultant Heap Leach)                  100 / hour
- Jim Caid (Civil / Structural Consultant)               90 / hour
- Dennis Rice (Process Engineer)                         75 / hour
- Bob Hayes (Mechanical Consultant)                      60 / hour
- Mike Garcia (Electrical Consultant)                    90 / hour
- Brad MacLean (Project Control Manager)                 95 / hour
- Bob Olson (Senior Estimator)                           70 / hour
- Armando Palafox (Procurement Manager )                 40/ hour
- Chuatemoc Herrera ( Mechanical Lead Engineer)          40 / hour
- Ulises Illerandi (Electrical/ Instrumentation Lead Engineer  40 / hour
- Benjamin Molina (Project control Engineer)             30 / hour
- Administrator (US)                                     70 / hour
- Clerical (US)                                          35 / hour
- Richard McRae (Project Sponsor)                        150 / hour
- Gary Gantner (Executive Sponsor)                       150 / hour
- Mario Eisenberg                                        90 / hour

Expenses for travel, accommodation, living allowances, administrative overheads shall be reimbursed at cost plus 5%

### TRIPLE I PERSONNEL (Consultant's Sub-consultants)

Labour Rate for all personnel shall be $23 / hour (USD) – without mark-up by Consultant. This all-in fixed rate includes allowances for actual wages, burdens, overheads and fee for profit.

Expenses for travel, accommodation, living allowances, administrative overheads, etc. shall be reimbursed at cost plus 5%

TRIPLE I will be reimbursed $500 per month or portion, of a month, for each office they provide, in Mexico City for non-Triple I employees.

## SCHEDULE 6 – COMPANY / CONSULTANT'S REPRESENTATIVE

| Company's Representative | Todd S. Fayram<br>General Manager<br>Compania Minera Dolores S.A. de C.V.<br>Lazaro de Baigorri #2<br>Parques de San Felipe<br>Chihuahua, Chih. 31203 Mexico<br>Facsimile:  614-426-6566<br>Email:  fayram@minefinders.com |
|---|---|

| Consultants Representative | Richard McRae<br>Project Sponsor<br>Ausenco Americas LLC<br>4005 North Flowing Wells Road<br>Tucson, AZ 85705<br>Fax (520) 292 2705<br>E-mail:  richard.mcrae@ausenco.com |
|---|---|

## SCHEDULE 7 – SENIOR EXECUTIVES

The Senior Executive for the Company is:

**Mark Bailey, President, Minefinders Corporation, Ltd.**

The Senior Executive for the Consultant is:

**Gary K. Gantner, President, Ausenco Americas LLC**

27

## SCHEDULE 8 – ADDRESS FOR DELIVERY OF NOTICES

| Company's Address | Compania Minera Dolores S.A. de C.V.<br>Lazaro de Baigorri #2<br>Parques de San Felipe<br>Chihuahua, Chih. 31203 Mexico<br>Facsimile: 614-426-6566<br>Email: fayram@minefinders.com |
|---|---|

| Construction Manager's Address | 4005 North Flowing Wells Road<br>Tucson, AZ 85705<br>Fax (520) 292 2705<br>E-mail: richard.mcrae@ausenco.com |
|---|---|

28

# EXHIBIT C



# Minefinders Corporation Ltd.

2288 – 1177 Hastings St.
Vancouver, BC  V6E 2K3  Canada
T + (604)687-6263 F + (604)687-6267
www.minefinders.com

August 1, 2007

Mr. Carlos Torres
Project Manager – Dolores Mine and Heap Leach Project
Ausenco
California No. 5307
Fraccionamiento Haciendas 3ʳᵃ Etapa
Chihuahua, Chihuahua 31215
Mexico

via email

**Re: Foundation Settlement in Crushing and Merrill Crowe Plant**

Mr. Torres,

It has come to our attention that there are severe foundation settlement issues in the crushing and Merrill Crowe platforms for the project.  These problems have culminated in extensive settling and consequent damage in the installations of the Merrill Crowe plant and to a lesser extent in the screening plant platform.  As a result of this situation, concrete pouring has been stopped in the screening platform as of the 19ᵗʰ of July.  In the Merrill Crowe plant, disassembly of much of the major plant equipment began at the same time in order to prevent damage to equipment and due to safety concerns.

We are aware that evaluations are under way to determine the root causes of the foundation movements, devise methods to stabilize the foundations, and to develop plans to either repair or remove and replace damaged parts of the structures.  In addition to the expert services supplied by Ausenco, Minefinders has also retained the services of Vector Engineering to provide independent assessment of the repairs proposed by Ausenco.

Upon review of the civil designs, it is apparent that many aspects of the fill operations were not carried out according to design.  Notably, site drainage requirements indicated on the platform designs are absent.  In addition, there is much anecdotal evidence that fills were not placed properly in many cases.

Minefinders, by way of this communication, is notifying Ausenco that all costs associated with this issue are to be borne by Ausenco. This includes, but is not limited to, all engineering services related to the evaluations, mitigation efforts, and any delays in contractor work and/or change orders arising out of this effort. We also request that Ausenco formally advise Minefinders of the position of Ausenco's insurers with respect to this situation.

Given the full ramifications of this problem will not become clear for some time, we suggest that separate cost centers be established for managing the costs related to this matter and that a system be put in place between our respective cost departments to agree on the direction of costs that may be a result of it.

Minefinders fully supports Ausenco's efforts to devise mitigation efforts that will preclude the necessity of removing all construction and fill. To the extent possible, we will assist with personnel and equipment in this effort. However, we must reiterate that management of this issue is Ausenco's responsibility. Ultimately, any repair short of excavation of the fill in the Merrill Crowe platform may affect our ability to insure the project against damage arising from foundation settlement issues and business interruption arising from same. Minefinders requires formal communication from Ausenco regarding proposals to manage this risk in the future.

I invite you to consider this issue and correspond with me as soon as possible in order to identify a suitable path forward. I may be reached by email or by phone in Chihuahua at office phone 52 614 430 2555 or cel 521 614 247 8451.

Sincerely yours,

Gregg Bush
Vice President Operations
Minefinders Corporation Ltd.


Cc:      Mark Bailey - Minefinders

# EXHIBIT D

**From:** Gregg Bush [mailto:gbush@minefinders.com]
**Sent:** Thursday, 18 October 2007 8:44 AM
**To:** Paul Leach

02/04/08

Cc: Tony Mazzei
**Subject:** RE: Rosales

Paul,

Sorry it has taken some time to find the information and sort through. I have a complete copy of the contract and have reviewed along with attachments you sent along with the letter you propose to send to Rosales. I have solicited this AM the associated old documents from the Ausenco Chihuahua office to determine if these can shed any light onto the question. I can offer the following observations based on the information I have see so far:

- The contract Appendix B contains the work specifications. The Earthworks specification is identified in the cover to Appendix B names 6 specs documents including one for Test and Control (EC-007 not EC-002 as identified in the document you provided) I have compared the two are they are the same material but in spanish.
- The Platform and Fill spec is identified in the contract as an Ausenco document (1571-000-C-008). This document is absent from the contract package.
- The spec you forwarded to me in your earlier mail is obviously not a controlled document. This, combined with the fact that the other 5 documents which were presented in the contract were document controlled, leads me to consider the possibility that the missing spec in the contract is not unique to the copy I have in my possession. (Yes, I am suggesting there is a possibility that it was never there.)
- Both specs supplied by you indicate in various paragraphs throughout the documents that Ausenco will require certain information and documentation to be provided, at various stages of the work process, upon the basis of which, authorization will be granted or withheld to proceed to the next step or lift.
- Your proposed letter to Rosales frankly admits that Ausenco does not in fact have any of the above mentioned documentation in its possession. I do not necessarily leap to the obvious conclusion that the Ausenco site supervisor and/o manager never requested or received it, but Rosales and their attorney certainly will.
- From a strictly moral standpoint I should highlight that the purpose of the specifications is to 1) guide the contractor in preparing his cost estimate, 2) provide a framework for controlling the quality of the work in progress, and 3) provide a framework for managing the contract and contractor during the course of the work. They are not intended as an after the fa witch hunting tool.
- I am not an attorney, but I suspect that any legal recourse you choose to pursue will quickly lead back to the question: "wha did Ausenco do to ensure that the specs were followed during the course of the work?" In other words, unless you can convince someone that the Rosales supervisor use force or guile to bypass Ausenco's supervision of the work according to the specifications, this will not earn you much more than Ausenco's markup to the client on the cost of mailing it.

Having said all of this, I am no fan of Rosales and I believe that they have gone to lengths to overcharge us and were in fact quite happy to pass off shoddy work as long as they could do so without consequence to themselves. I am, nevertheless, hesitant to accuse them of a sin they likely did not commit to make up for all of the others I believe that they have committed.

I believe that how you pursue this is ultimately up to you and Ausenco's management, but Minefinders image and reputation could be impacted by the course of action you choose. I believe that a better course of action, given that I believe that your legal argument is a very weak one, would be to sit down with Rosales management and suggest that you consider them to be in breach and solicit a response. Your hand is so weak; your best bet is to try to get them to show you theirs. A "notice of breach" letter will only channel any future discussion to a venue where I believe that you cannot possibly win. Your concerns of having the window c opportunity close should not be valid as long as there are minutes of all discussions held with them signed by both parties.

I am happy to discuss further at your convenience by email or telephone.
Atte., Bush